

NUMBER 13-08-00542-CV

# COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

RIO GRANDE REGIONAL HOSPITAL, INC.
AND COLUMBIA RIO GRANDE HEALTHCARE,
L.P. D/B/A RIO GRANDE REGIONAL HOSPITAL,                  Appellants,

v.

DIANA LOPEZ VILLARREAL, INDIVIDUALLY AND
AS REPRESENTATIVE OF THE ESTATE OF HERMES
VILLARREAL, DECEASED, AND AS NEXT FRIEND OF
SARAH VILLARREAL, LAUREN VILLARREAL, AND
HERMES ALEJANDRO VILLARREAL, MINORS, AND
HERMELINDA VILLARREAL,                                    Appellees.

On appeal from the 389th District Court
of Hidalgo County, Texas.

# O P I N I O N

Before Chief Justice Valdez and Justices Yañez and Benavides
Opinion by Chief Justice Valdez

This appeal stems from a wrongful death and survival action based on a health care liability claim brought by appellees, Diana Lopez Villarreal, individually and as representative of the estate of Hermes Villarreal, deceased, and as next friend of Sarah Villarreal, Lauren Villarreal, and Hermes Alejandro Villarreal, minors, and Hermalinda Villarreal, individually, against appellants, Rio Grande Regional Hospital, Inc. and Columbia Rio Grande Healthcare, L.P. d/b/a Rio Grande Regional Hospital. Appellees' cause of action pertains to the suicide of former McAllen attorney, Hermes Villarreal, while he was in appellants' care. After a trial, the jury concluded that appellants were 75% responsible for Hermes's injuries and death and awarded damages to appellees; however, the trial court signed a final judgment awarding appellees $685,600 in actual damages, after applying the applicable damage caps, $43,380.98 in pre-judgment interest, and court costs.

By four issues, appellants argue that: (1) the record contains no evidence establishing that appellants should have reasonably foreseen that Hermes would commit suicide; (2) there is no evidence that the nurses' alleged acts or omissions were a substantial factor in bringing about Hermes's death; (3) appellees failed to establish that any of appellants' actions were the cause-in-fact of Hermes's death; and (4) the jury erred in rejecting appellants' affirmative defense of suicide. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 93.001(a)(2) (Vernon 2005). On cross-appeal, appellees assert that: (1) the trial court erred in allowing the jury to consider Hermes's proportionate responsibility in causing his own death; and (2) the trial court erroneously applied the $250,000 damages cap outlined in section 74.301 of the civil practice and remedies code and, instead, should have applied the damages cap provided in section 74.303 of the civil practice and remedies

2

code, which caps damages at $500,000 adjusted by the consumer price index. *See id.* §§ 74.301, 74.303 (Vernon 2005). We affirm.

## I. BACKGROUND

This dispute pertains to a jury verdict entered by a Hidalgo County jury involving the treatment and, ultimately, the death of Hermes. Hermes was a lawyer who ran his own law firm in Pharr, Texas. Hermes was married and had three children, Sarah, Lauren, and Alejandro. In addition, Hermes was very close to his mother, Hermalinda, and he often offered various forms of assistance, including money, to Hermelinda.[1] By all accounts, Hermes had a close and loving relationship with his family.

Beginning in April 2005, Hermes began experiencing strange sensations in his ears, insomnia, anxiety, and severe, unrelenting headaches. Hermes believed that these maladies were related to his ear, and he complained that he felt "air coming out of one of his ears." Because of these symptoms, Hermes was unable to sleep, concentrate, think clearly, and follow what people were saying, and, because he had never experienced symptoms such as these before, he became "extremely anxious." As a result, Hermes scheduled an appointment with a local neurologist, Ruy Miereles, M.D. In an attempt to determine the cause of his abnormal symptoms, Dr. Mireles recommended that Hermes undergo an MRI on his brain. Hermes agreed, and the MRI was conducted on April 14, 2005.

While awaiting the results of the MRI, Hermes continued to suffer anxiety, insomnia, and severe headaches. Hermes began to consider traveling to San Antonio to seek additional help for these symptoms. Hermes was very worried and concerned about his

---

[1] Hermelinda testified at trial that she was single and that Hermes's biological father left the family when Hermes was six years old.

3

health. He was described as a "type A personality" at trial and someone who was "driven," "self-motivated," and did not take shortcuts. By April 16, 2005, Hermes had experienced these symptoms for three or four days and had not slept at all. Hermes's sister, Edna Eckroat, testified that shortly before April 16th, she and Hermelinda met Hermes for lunch. At that meeting, Hermes appeared to be sleep-deprived, and he disclosed to them some of the health problems he was having.

In the early morning hours of April 16, 2005, Diana, Hermes's wife, awoke to find Hermes sitting at the kitchen table. Diana was immediately concerned because it appeared that Hermes, once again, had failed to sleep. Hermes asked Diana to sit at the table, and he began to explain that the symptoms were not going away and that he intended to travel to a hospital in San Antonio to find out what was causing the symptoms. At this time, he handed Diana a letter, which was admitted into evidence at trial.[2] Hermes felt like he was losing his mind and suggested that he may be committed to a mental institution in San Antonio. Diana panicked and argued that the San Antonio hospital was too far away for her to be with him. Diana convinced Hermes to go to Rio Grande Regional Hospital in McAllen, Texas, instead.

## A. Hermes's Admission to Rio Grande Regional Hospital

Once Diana had convinced Hermes to go to Rio Grande Regional Hospital for

---

[2] Diana testified that the letter Hermes gave her on April 16th did not worry her because Hermes regularly wrote her notes with lists of things to do, contact information, where to get money, and similar matters whenever he was traveling out of town. Diana believed that this letter was similar to other notes Hermes had written in the past, so she read a line or two of the letter and placed the letter in her purse. The letter apparently began with the following statements: "If anything happens, sweetheart, please forgive me. You should be strong." Diana denied ever hearing Hermes tell her that he intended to close down his law practice; she only recalled Hermes stating that he was concerned about his health because of the severe headaches.

At various times during Hermes's hospitalization, Diana came to the hospital to visit Hermes. Appellants assert that, despite her trips to the hospital, at no time did Diana inform doctors about the contents of the April 16, 2005 letter written by Hermes.

4

treatment, it was between four and five in the morning on April 16. Because the children were asleep, Diana arranged for Hermes's sister, Eckroat, to meet Hermes at the hospital. Diana agreed to join Hermes shortly thereafter, once she made arrangements for the care of the children.

Upon arriving at Rio Grande Regional Hospital, Hermes was admitted and attended to by Marvin Tavarez, M.D. Hermes relayed his symptoms to Dr. Tavarez, and Dr. Tavarez noted the complaints in Hermes's medical records. Regarding Hermes's initial complaints, Dr. Tavarez testified that:

> This 41-year-old male [Hermes] that [sic] was sent to the hospital because of recurrent severe headaches. His headache had gotten so severe especially in the past several days, three to four days, where he feels that he passes out and all of a sudden turns black.
>
> . . . .
>
> He has to grab unto [sic] something for a few seconds and then he feels better.

Further, Dr. Tavarez's notes for trial, entitled "Death Summary," indicate that:

> [Hermes] has been extremely anxious, he is nervous, complaining that this headache has been severe and he cannot sleep for the past 3 to 4 days. The patient has not slept day and night. He complains that when he goes to the office[,] he was not able to think clearly. He is exhausted. He has been under a lot of pressure. He is very busy. Other than this, the patient did not have any syncopal[3]episode, although he does complain of some tingling sensation sometimes in his face and all his extremities compatible with hyperventilation. This patient has denied any problem with depression, etc. He has never expressed any problem with depression. However, in talking to Dr. Mireles, he also never had any suggestion that the patient was depressed.

Dr. Tavarez admitted Hermes with a diagnosis of "[s]evere recurrent headaches,

---

[3] "Syncope" is defined as the "[p]artial or complete loss of consciousness with interruption of awareness of oneself and ones surroundings. When the loss of consciousness is temporary and there is spontaneous recovery, it is referred to as syncope or, in non[-]medical quarters, fainting." Definition of Syncope, MedicineNet.com, *available at* http://www.medterms.com/script/main/art.asp?articlekey=5612 (last visited Sept. 29, 2010).

5

fatigue, fainting-like spells, and questionable hyperventilation." Dr. Tavarez admitted that Hermes's symptoms warranted hospitalization and noted that the hospital staff would evaluate Hermes further. Dr. Tavarez ordered that Hermes be assigned to a private room in the hospital. Lab work was also ordered, and Hermes was placed on a Holter monitor—a telemetry monitor—because Hermes had complained that his heart was racing and that he was dizzy. An EKG, otherwise known as an electrocardiogram, was also ordered in addition to a daily dose of ten milligrams of Lexapro, an antidepressant medication.

Hermes was then directed to the telemetry unit, where his chest was shaved and five EKG transmitters, which monitor the heart, were placed on his chest. These transmitters relayed information to the nurses' station in the hospital for further evaluation; if the transmitters were ever removed, the equipment would immediately notify the nurses of the disconnection.

Once Hermes was outfitted with the EKG transmitters, Tommy Yee, M.D., a neurologist, visited with Hermes.[4] After speaking with Hermes, Dr. Yee made notes similar to those of Dr. Tavarez regarding Hermes's symptoms. Dr. Yee noted that there was a family history of schizophrenia, but admitted that Hermes denied being depressed. Dr. Yee recommended that Dr. Tavarez wait on the results of the April 15 MRI conducted by Dr. Mireles to determine further treatment. Dr. Yee prescribed Hermes "a mild anti[-]anxiety medication"[5] and suggested that Hermes undergo a psychiatric consultation; however, Dr.

---

[4] Dr. Tavarez noted that Dr. Mireles was not available on April 16, so Dr. Yee was asked to treat Hermes.

[5] The anti-anxiety medication prescribed by Dr. Yee was later identified at trial as 0.25 milligrams of Xanex, to be given by mouth when Hermes experienced insomnia and every four hours afterwards as needed for sleep. Appellants' expert, Jan Allen Fawcett, M.D., testified that she is a physician and psychiatrist and that the dosage of Xanex given to Hermes was the "lowest prescribable [sic] dose" and was a "geriatric dose."

Yee stated that the necessity of the psychiatric consultation was left to Dr. Tavarez's discretion.

**B.      Nurse Gaye Lapura Bergado's Care of Hermes on the Evening of April 17**

At 7:00 p.m. on April 17, 2005, Gaye Lapura Bergado, R.N., began serving as Hermes's attending nurse.   In her deposition, Nurse Bergado remembered first seeing Hermes walking the halls of the hospital a little before 9:00 p.m. on April 17.   Nurse Bergado assessed Hermes's health and noticed that doctors had diagnosed Hermes with "recurrent severe headaches, anxiety, and . . . fainting spells or syncope."  Nurse Bergado stated that Dr. Yee had conducted a psychiatric consultation with Hermes the previous day. Nurse Bergado recalled that Hermes was sleep-deprived given that he had not slept well for several days.   In conducting her assessment, Nurse Bergado utilized the "Glasgow Coma Scale"[6] and other measures and concluded that Hermes was strong, alert, and required no risk-behavior precautions.  Nurse Bergado also conducted an initial psychiatric check and noted that Hermes was "alert and orientated" and was not violent, aggressive, or destructive.  Nurse Bergado admitted that Hermes's medical records included a notation that a "psychiatric consult" had been conducted and indicated that Hermes may have had a "psychiatric problem."  In any event, Nurse Bergado determined that she did not need to do any neurological assessment or management or assess Hermes's "coping and support" needs.  Nurse Bergado testified that Hermes was "very alert" and "oriented" and that he verbalized or expressed what he felt.  At 9:00 p.m., Nurse Bergado, upon his request, gave

---

Dr. Fawcett also recounted Hermes's health history, which included hospitalizations in 1992, 1996, and 2000 for anxiety, and noted that Xanex had been previously prescribed to treat Hermes's anxiety.

[6] The "Glascow Coma Scale" is a "scale for measuring the level of consciousness, especially after a head injury, in which scoring is determined by three factors: amount of eye opening, verbal responsiveness, and motor responsiveness."  Glascow Coma Scale, *available at* http://medical-dictionary.thefreedictionary.com/Glascow+Coma+Scale (last visited Sept. 21, 2010).

7

Hermes 0.25 milligrams of Xanex. A couple hours later, Hermes complained to Nurse Bergado about a headache, and, after speaking with Dr. Tavarez, Nurse Bergado gave Hermes one gram of Tylenol.

Hermes's medical records reflect that at 6:00 a.m. on April 18, Nurse Bergado's shift was over and she was ready to give her report to the next shift nurse, Nora Munoz, R.N. Nurse Bergado subsequently gave her report to Nurse Munoz prior to leaving the hospital at 7:00 a.m.[7]

## C.      The Results of the MRI

At some point during the day on April 18, Dr. Mireles visited with both Hermes and Diana at the hospital. Dr. Mireles informed Hermes and Diana of the results of the MRI, which revealed that Hermes's brain was functioning normally. Dr. Mireles emphasized that Hermes needed to relax and rest. However, the results of the MRI did not comfort Hermes because he was still concerned about his apparent inability to sleep and the recurring headaches. In light of Hermes's concerns, the doctors at the hospital suggested that Hermes extend his hospital stay and plan to be discharged from the hospital on April 19. Hermes and Diana were both very concerned about Hermes's symptoms, especially in light of the fact that there was "no physical explanation."

## D.      Nurse Bergado's Care of Hermes on the Evening of April 18

Nurse Bergado returned to the hospital to work another shift on the evening of April 18. She testified that around 8:00 p.m., she resumed caring for Hermes. At this time, Nurse Bergado checked Hermes's vital signs. Nurse Bergado recalled that doctors had included in Hermes's medical records that the checking of his vital signs should be

---

[7] Nurse Bergado stated that she worked at the hospital as a shift nurse on April 17, 2005, from 7 p.m. to 7 a.m. the next day.

discontinued while Hermes was sleeping. In addition, Hermes was not allowed any visitors at night so that he could get some sleep. Even though doctors ordered that Hermes's vital signs were not to be checked while he was sleeping, appellees' expert, Suzanne Frederick, R.N., noted that the nurses were still required to check on Hermes throughout the night under the applicable standard of care for nurses.

In any event, shortly after Nurse Bergado took his vital signs, Hermes began walking the hallways of the hospital. Nurse Bergado's notes indicate that around 8:30 p.m. on April 18, Hermes took a shower, even though he had already previously showered earlier in the day at 12:00 p.m. Once he finished showering at 9:00 p.m., Hermes was given one 0.25 milligram tablet of Xanex by mouth. Approximately an hour later, Hermes was given one ten-milligram tablet of Ambien, a hypnotic that "is given to help people sleep." This was the first time Hermes had ever taken Ambien.[8]

Nurse Bergado believed that after taking these medications, Hermes slept until she was summoned by Hermes for more Xanex at 2:00 a.m. on April 19. Nurse Bergado gave Hermes another 0.25 milligram tablet of Xanex even though she was "concerned" about the additional dosage. Nurse Bergado also acknowledged that when Hermes summoned her at 2:00 a.m., he appeared to be very anxious and did not appear to have slept much. In fact, Nurse Bergado later admitted that she was unsure if Hermes had slept at all. Nurse Bergado testified that she checked on Hermes some time between 2:00 and 4:00 a.m. on April 19 and again at 4:00 a.m. She recalled seeing Hermes asleep at 4:00 a.m.

At 5:00 a.m. on April 19, Hermes once again summoned Nurse Bergado. At this

---

[8] Diana testified that Hermes was generally reluctant to take any kind of medication and that Ambien had been previously prescribed for Hermes's inability to sleep; however, Hermes never consumed any of the medication, as evidenced by the fact that Diana counted all of the Ambien pills in the bottle and determined that no pills were missing.

time, he requested toiletries and a razor so he could shave portions of his chest where the EKG transmitters were placed. Hermes specifically indicated to Nurse Bergado that he wanted to shower and shave his chest himself. Nurse Bergado went to the supply room of the hospital and retrieved various toiletries and a double-edged razor, which Nurse Bergado testified was the same type of razor given to all patients. Upon returning to Hermes's room with the supplies, Nurse Bergado assisted Hermes in removing the EKG transmitters, gave him the double-edged razor and other toiletries, and then left the room. Even though both Nurses Munoz and Frederick testified that it was unusual for a nurse to allow a patient to shave his own chest and that nurses typically shave a patient's body hair, Nurse Bergado did not believe that Hermes's request was odd. Moreover, Nurse Bergado did not believe that Hermes was suicidal when she gave him the razor.

Nurse Bergado testified in her deposition that Hermes began taking a shower a little after 5:00 a.m. and that she should have checked to see how he was doing about an hour later at 6:00 a.m.[9] The record, however, does not indicate that Nurse Bergado checked on Hermes again. Hermes's medical records showed that Nurse Bergado was ready to give her report to Nurse Munoz, the next shift nurse, at 6:00 a.m. on April 19. Upon completing her shift at 7:00 a.m., Nurse Bergado informed Nurse Munoz that Hermes was still in the shower and that he had indicated that he would call the nurses when he had completed his shower. It is undisputed that no one saw Hermes from around 5:00 a.m. to approximately 8:30 a.m., while he was purportedly in the shower.[10]

---

[9] Testimony at trial described Hermes's hospital room as containing a sink and mirror outside of the area designated as the bathroom and not enclosed; thus, it was possible for Hermes to shave his chest while looking in the mirror in his hospital room so that the nurses could easily observe him.

[10] A telemetry reading was produced at 7:34 a.m. on April 19, noting that the EKG transmitters were not being used by Hermes and indicating that Hermes was in the shower.

10

Shortly after 7:30 a.m., Nurse Munoz looked in Hermes's room and discovered that he was not in his bed. She later tried to open the bathroom door, but the door was locked. She saw a breakfast tray prepared for Hermes "just sitting there" undisturbed and uneaten. Nurse Munoz asked another nurse to come over and try to open the door. This second attempt to open the bathroom door was unsuccessful, so maintenance was called to remove the door with a screwdriver.

Once the bathroom door was removed, the nurses found him dead in the bathtub.[11] An investigation revealed that Hermes had horribly mutilated himself with the double-edged razor and then bled to death over the course of a couple hours. Upon discovering Hermes dead in the bathtub, the nurses found a suicide note that had been written by Hermes. In this note, Hermes asked for forgiveness and noted that he had descended into madness and that, by killing himself, he intended to spare his family the shame he associated with commitment to a mental institution.

Expert testimony presented by appellees described Hermes's death as a slow exsanguination, or bleeding to death. Appellees' experts testified that Hermes was probably alive as late as 8:00 a.m. and possibly 8:15 a.m., before he bled to death.[12] Dr. Tavarez stated that he believed that Hermes died at approximately 7:45 a.m.[13] An autopsy report indicated that Hermes cut himself on both sides of his neck and both arms. Robert

---

[11] Hermes's body was discovered in the bathroom at approximately 8:25 a.m. on April 19.

[12] This statement was supported by notes contained in Hermes's medical records that Dr. Tavarez listened for Hermes's heartbeat and discussed possibly intubating Hermes as late as 8:34 a.m.; thus, appellees' experts concluded that when Hermes's body was discovered, he was "just freshly deceased." Further, Hermes's medical records reflected that Hermes's body was flaccid and that rigor mortis had not set in when his body was discovered.

[13] However, on cross-examination, Dr. Tavarez contradicted himself by testifying that "[at] 7:45 [a.m.,] he was alive. I was there at 8:00 o'clock [sic] in the morning."

Charles Bux, M.D., a board-certified anatomical, clinical, and forensic pathologist and one of appellees' expert witnesses, testified that he believed that Hermes cut his neck first, his left arm second, and his right arm at the elbow third. Dr. Bux believed that the cut to Hermes's right arm was the injury that proved to be fatal.[14]

## E.     The Lawsuit

Appellees filed their original petition against appellants, among others, on August 16, 2006, asserting medical malpractice claims pertaining to Hermes's death. Doctors Mireles, Marvin Tavarez, Hiram Tavarez, and Yee were also named as parties to appellees' original petition; however, these individuals were non-suited and are not parties to this appeal. Appellees' live pleading, their fourth amended petition, was filed on January 16, 2008, and asserted wrongful death and medical malpractice claims against appellants specifically and alleged that appellants were negligent in: (1) "[f]ailing to properly, adequately and/or timely assess HERMES VILLARREAL"; (2) "[p]roviding HERMES VILLARREAL with a double[-]edged razor"; (3) "[f]ailing to properly and timely monitor and/or check-on HERMES VILLARREAL"; (4) "[f]ailing to provide a safe environment"; (5) "[f]ailing to contact attending physician(s)"; (6) "[f]ailing to give a proper report to the

---

[14] In his "Death Summary," Dr. Tavarez noted the following regarding Hermes's death:

> I did not see this patient [Hermes] from the time he was admitted on Saturday, and then I came in on Tuesday morning to make rounds, and was advised that the patient was in the shower, but he was not answering. At that time, the head nurse had already ordered a call for security to come and open the door. This was opened shortly thereafter, and the patient was found in the tub unconscious. He had cut his wrist, his elbows anteriorly, and also his throat bilaterally slashed. He had some blood in the anterior chest and upper stomach which had already started coagulating. There was also some blood in the tub, which was minor compared to the lesion that he had, but it is possible that this blood had run down the drain. The patient was in a position, because of the place of the tub, the patient was lying in the same face up. He was hard to examine, he was moved by the nurses to the floor outside the bathroom, so that we could examine him. At that time, we thought maybe if we would have to intubate, this would be a better position. However, upon examination, pupils were dilated and fixed. The patient was not breathing, there was no heart sound, and the patient was pronounced dead. The supervisor called the necessary personnel in the hospital[,] and the police department was also called. After that, the police took over.

oncoming nurse, assigned to care for HERMES VILLARREAL"; and (7) "[v]iolating hospital policies and procedure by failing to take suicide precautions." Appellees also asserted that appellants were responsible for the negligent actions of its nurses and doctors under the theory of respondeat superior.[15] Further, appellants requested damages on behalf of Diana, Sarah, Lauren, Alejandro, and Hermelinda under the wrongful death and survival provisions of the civil practice and remedies code. *See id.* §§ 71.001-.022 (Vernon 2008). Appellants filed three supplemental answers challenging the causation element of appellees' causes of action and asserting the affirmative defense of suicide. *See id.* § 93.001(a)(2).

The case proceeded to trial, and after several weeks of trial, the jury concluded that appellants were negligent in their treatment of Hermes and apportioned them 75% responsible for Hermes's death. The jury also concluded that Diana and Hermes were 15% and 10% responsible, respectively, and awarded appellees several million dollars in damages. The trial court, however, reduced the jury's damage award in accordance with the statutory damage caps outlined in section 74.301 of the civil practice and remedies code. *See id.* § 74.301 (Vernon 2005) (capping non-economic damages for each claimant in a health care liability claim at $250,000). The trial court's damage award is as follows:

- Diana: $45,325 in non-economic damages, $110,700 in economic damages, and $11,024.51 in pre-judgment interest for a total of $167,049.51;

- Sarah: $58,475 in non-economic damages, $78,300 in economic damages, and $7,797.82 in pre-judgment interest for a total of $144,572.82;

---

[15] Respondeat superior is a legal theory based on vicarious liability in which one party, though not negligent itself, is responsible for the negligence of another party based on the relationship between the parties. *See Vecellio Ins. Agency, Inc. v. Vanguard Underwriters*, 127 S.W.3d 134, 138 (Tex. App.–Houston [1st Dist.] 2003, no pet.); *St. Anthony's Hosp. v. Whitfield*, 946 S.W.2d 174, 178 (Tex. App.–Amarillo 1997, writ denied); *see also Pickard v. Brown*, No. 13-07-00245-CV, 2009 Tex. App. LEXIS 369, at **17-18 (Tex. App.–Corpus Christi Jan. 22, 2009, no pet.) (mem. op.).

- Lauren: $58,475 in non-economic damages, $78,300 in economic damages, and $7,797.82 in pre-judgment interest for a total of $144,572.82;

- Alejandro: $58,475 in non-economic damages, $78,300 in economic damages, and $7,797.82 in pre-judgment interest for a total of $144,572.82; and

- Hermelinda: $29,250 in non-economic damages, $90,000 in economic damages, and $8,963.01 in pre-judgment interest for a total of $128,213.01.

In sum, appellees were awarded $728,980.98 in damages, plus court costs and post-judgment interest.

Shortly thereafter, appellees filed a motion to modify and a motion for new trial, contending that the jury incorrectly apportioned Diana 15% negligent for Hermes's death and that the trial court should have applied the statutory damage cap described in section 74.303 of the civil practice and remedies code rather than section 74.301. *See id.* § 74.303(a)-(b) (Vernon 2005) (providing that in a wrongful death or survival action on a health care liability claim, the limit of civil liability for all damages, including exemplary damages, is $500,000 for each claimant and this amount shall be increased or decreased "by a sum equal to the amount of such limit multiplied by the percentage increase or decrease in the consumer price index . . . between August 29, 1977, and the time at which damages subject to such limits are awarded by final judgment or settlement"). Appellees argued that by applying the section 74.303 damage cap, the trial court should have awarded them $1,788,325 in damages.[16] The record does not reflect that the trial court ruled on appellees' motion to modify and motion for new trial; thus, these motions were overruled by operation of law. *See* TEX. R. CIV. P. 329b(c).

---

[16] Appellees arrived at this calculation by dividing the July 2008 consumer price index (219.964) by the August 29, 1977 consumer price index (61.5), which equals 3.576650, and then multiplying that number by the $500,000 damages cap provided in section 74.303. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.303(a)-(b) (Vernon 2005).

14

Appellants filed a motion to modify and a motion for judgment notwithstanding the verdict. Both of these motions were denied by the trial court. Appellants and appellees both timely filed notices of appeal in this matter.

## II. LEGAL SUFFICIENCY

In their first three issues, appellants challenge the legal sufficiency of the evidence supporting the jury's verdict. Specifically, appellants assert that the record contains no evidence that: (1) Hermes's suicide was foreseeable by hospital employees; (2) the nurses' alleged acts or omissions were a substantial factor in bringing about Hermes's death, or, in other words, that Hermes's suicide was an intervening and superseding cause; and (3) Hermes's death was proximately caused by the breach of a legal duty owed by appellants to Hermes. Appellees counter by arguing that it was foreseeable for hospital employees to anticipate that some injury would occur given Hermes's symptoms, the medication he was taking, the fact that Nurse Bergado gave him a double-edged razor and allowed him to shave his own chest, and the fact that no one checked on Hermes for almost three hours on the morning of April 19. Appellees further argue that the record reflects that: (1) appellants' actions and omissions were a substantial factor in causing Hermes's death; (2) appellants owed Hermes a duty to act reasonably during his stay at the hospital; and (3) Hermes's suicide was not an intervening and superceding cause.

## A. Standard of Review

In a legal sufficiency, or "no-evidence" review, we determine whether the evidence would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). In making this determination, we credit favorable evidence if a reasonable fact-finder could, and we disregard contrary

15

evidence unless a reasonable fact-finder could not. *Id.* We consider the evidence in the light most favorable to the finding under review and indulge every reasonable inference that would support it. *Id.* at 822. So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the fact-finder. *Id.* The trier of fact is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id.* at 819. Although we consider the evidence in the light most favorable to the challenged findings, indulging every reasonable inference that supports them, we may not disregard evidence that allows only one inference. *Id.* at 822.

Because the jury is the sole judge of the witnesses' credibility, it may choose to believe one witness over another, and this Court cannot impose its own opinion to the contrary. *Id.* at 819; *see Arias v. Brookstone, L.P.*, 265 S.W.3d 459, 468 (Tex. App.–Houston [1st Dist.] 2007, pet. denied). Further, we must assume that the jury resolved all conflicts in accordance with its verdict if reasonable human beings could do so. *City of Keller*, 168 S.W.3d at 819; *Arias*, 265 S.W.3d at 468.

**B.  Applicable Law**

In a medical malpractice case, the plaintiff is required to show evidence of a reasonable medical probability that the injury was proximately caused by the defendant's negligence. *Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995); *Duff v. Yelin*, 751 S.W.2d 175, 176 (Tex. 1988). The plaintiff must prove: (1) a duty on the part of the defendant to act according to applicable standards of care; (2) a breach of the applicable standard of care; (3) an injury; and (4) a causal connection, or proximate causation, between the breach of the standard of care and the injury. *See Ocomen v. Rubio*, 24 S.W.3d 461, 466 (Tex. App.–Houston [1st Dist.] 2000, no pet.); *see also Mariner*

16

*Health Care of Nashville, Inc. v. Robins*, No. 01-08-00830-CV, 2010 Tex. App. LEXIS 5114, at *21 (Tex. App.–Houston [1st Dist.] July 1, 2010, no pet.).

In the instant case, the parties' arguments center on the causation element. Proximate causation is comprised of two components: (1) the cause-in-fact or "substantial factor"; and (2) foreseeability. *Transcon. Ins. Co. v. Crump*, No. 09-0005, 2010 Tex. LEXIS 616, at **28-29 (Tex. Aug. 27, 2010) (citing *IHS Cedars Treatment Ctr. of Desoto, Tex., Inc. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2003)); *Leitch v. Hornsby*, 935 S.W.2d 114, 118-19 (Tex. 1996); *Travis v. City of Mesquite*, 830 S.W.2d 94, 98 (Tex. 1992). Foreseeability requires that a person of ordinary intelligence would have anticipated the danger caused by the negligent act or omission. *Doe v. Boys Clubs of Greater Dallas*, Inc., 907 S.W.2d 472, 478 (Tex. 1995). Foreseeability does not require that a person anticipate the precise manner in which an injury will occur once he has created a dangerous situation through his negligence. *See Travis*, 830 S.W.2d at 98. Instead, foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable. *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex. 1996); *see Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 785 (Tex. 2001). Thus, the question of foreseeability involves a practical inquiry based upon "common experience applied to human conduct." *City of Gladewater v. Pike*, 727 S.W.2d 514, 518 (Tex. 1987) (citing *Cook Consultants, Inc. v. Larson*, 700 S.W.2d 231, 236 (Tex. App.–Dallas 1985, writ ref'd n.r.e.)); *see Hall v. Sonic Drive-In of Angleton, Inc.*, 177 S.W.3d 636, 648-49 (Tex. App.–Houston [1st Dist.] 2005, pet. denied). Importantly, "[f]oreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury." *Boys Club of Greater Dallas, Inc.*, 907 S.W.2d at 478.

17

On the other hand, "[t]he test for cause-in-fact is whether the act or omission was a substantial factor in causing the injury 'without which the harm would not have occurred.'" *Harrison*, 70 S.W.3d at 784 (quoting *Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 477). Evidence that shows only that the defendant's alleged negligence did no more than furnish a condition that made the alleged injuries possible will not suffice to establish the "cause-in-fact" component of proximate cause. *See Mason*, 143 S.W.3d at 799. Moreover, because both cause-in-fact and foreseeability elements are required in establishing proximate causation, a claimant who establishes only that an injury was foreseeable cannot prevail. *See Grider v. Mike O'Brien, P.C.*, 260 S.W.3d 49, 57 (Tex. App.–Houston [1st Dist.] 2008, pet. denied); *see also Robins*, 2010 Tex. App. LEXIS 5114, at *22.

Whether a particular act of negligence is a cause-in-fact of an injury is a particularly apt question for jury determination. *Farley v. MM Cattle Co.*, 529 S.W.2d 751, 756 (Tex. 1975); *see Tex. Dep't of Transp. v. Pate*, 170 S.W.3d 840, 848 (Tex. App.–Texarkana 2005, pet. denied). Further, the jury has broad latitude to infer proximate cause from the evidence and the circumstances surrounding the injury-producing act, especially when it is not possible to produce direct proof of proximate cause or lack of proximate cause. *J.K. & Susie Wadley Research Inst. & Blood Bank v. Beeson*, 835 S.W.2d 689, 698 (Tex. App.–Dallas 1992, writ denied) (citing *Harris v. LaQuinta-Redbird Joint Venture*, 522 S.W.2d 232, 236 (Tex. Civ. App.–Texarkana 1975, writ ref'd n.r.e.)).

"In a medical malpractice case, breach of the standard of care and proximate cause must be established through expert testimony." *Ocomen*, 24 S.W.3d at 466. Opinion testimony that amounts to "mere conjecture, guess, or speculation" is not sufficient.

18

*Mason*, 143 S.W.3d at 798-99; *Price v. Divita*, 224 S.W.3d 331, 337 (Tex. App.–Houston [1st Dist.] 2006, pet. denied). Expert opinion testimony that is conclusory or speculative does not tend to make the existence of a material fact "'more probable or less probable,'" and it is neither relevant nor competent. *Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 232 (Tex. 2004) (quoting TEX. R. EVID. 401).

Proximate causation in a medical malpractice case must be based upon reasonable medical probability, *see Park Place Hosp. v. Estate of Milo*, 909 S.W.2d 508, 511 (Tex. 1995), and "[t]he quantum of proof required is simply that it is more likely than not that the ultimate harm or condition resulted from such negligence." *Kramer v. Lewisville Mem'l Hosp.*, 858 S.W.2d 397, 400 (Tex. 1993). A plaintiff is not required to exclude every other reasonable hypothesis, *see Marvelli v. Alston*, 100 S.W.3d 460, 470 (Tex. App.–Fort Worth 2003, pet. denied), and more than one proximate cause may exist. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001) (determining whether the wrongful act "was 'a' proximate cause, not 'the' proximate cause" of decedent's death).

## C.    Discussion

On appeal, appellants challenge the two components—cause-in-fact and foreseeability—of causation pertaining to appellees' medical malpractice claims. Appellants do not dispute the duty and breach elements of appellees' cause of action. In the trial court, the crux of appellees' claims against appellants pertained to the failure of hospital staff to properly assess Hermes's psychiatric needs and Nurse Bergado's actions of providing Hermes a double-edged razor to shave his chest by himself and not checking on him for approximately three hours, even though he was heavily medicated and had not slept much due to his illness.

19

### 1. Appellees' Evidence

At trial, Suzanne Frederick, R.N., a registered nurse with ample experience as critical care director and nurse supervisor at several different hospitals, testified that the standard of care for the nurses at the hospital was to: (1) closely monitor the effects of the various medications that Hermes was taking, including those he had never taken before; (2) assist Hermes in taking a shower so as to prevent him from falling down or fainting in the shower; and (3) provide a safe environment, which did not include providing Hermes with a double-edged razor to shave his chest by himself. Nurse Frederick then explained the precautions associated with the various medications that Hermes was prescribed. In particular, Nurse Frederick noted that Xanex and Lexapro contain warnings regarding the potential for causing patients to commit suicide. She also noted that Hermes was prescribed Xanex for previous headaches, but he had never taken Ambien before. She later described the potentiating effect[17] that Xanex and Ambien have, both of which cause the depression of the central nervous system, dizziness, drowsiness, and unsteady walking. In fact, both of these medications contain explicit instructions from the manufacturer cautioning those who take the drugs to not operate heavy machinery. Nurse Frederick also testified that, because of the potentiating effect of the drugs and because Hermes had never taken Ambien before, Nurse Bergado should have assessed Hermes's health more regularly and monitored him for side effects.

Regarding Hermes's request for a razor and a shower, Nurse Frederick stated that Nurse Bergado should not have allowed Hermes to shower by himself given the potential

---

[17] Potentiation is defined as "a synergistic action in which the effect of two drugs given simultaneously is greater than the sum of the effects of each drug given separately." Potentiation, *available at* http://medical-dictionary.thefreedictionary.com/potentiation (last visited Sept. 21, 2010).

effects of the drugs on Hermes. She also stated that Nurse Bergado should have viewed Hermes's third shower request in the last seventeen hours as suspicious and that she should not have allowed Hermes to shave his chest by himself. Specifically, Nurse Frederick stated that:

> This guy has anxiety. She [Nurse Bergado] testified that the reason she gave him the Xanex was because of anxiety. Obviously[,] he hadn't slept hardly at all during the night, maybe a little but not much. And then he's asking for a razor saying it's to shave his chest. Well, the nurses do the shaving of the chest. Plus[,] the chest gets shaved when we put those leads on initially. Those leads had to come off at 8:00 p.m. Those leads had to come off at 12:00. And then one other time he had a shower during his stay, I believe? And so it is suspicious and she should have been suspicious and she should have worried. She should have talked to him and asked him why do you want to do this? I'm uncomfortable with you taking a shower. Most of all, she shouldn't have let him to go to the shower, lock the door[,] and be in there all by himself.

> The standard of care is to, like the Nurse Practice Act says, is to provide a safe environment. In the least[,] she should have asked him to keep that shower door open, and I'm going to stand right outside this room because I'm afraid you're going to fall. Or she should have said, listen, it's five in the morning. Let's wait until your wife gets here. Let somebody be in there with you. She should have reasoned with him. She should have asked him what's going on? What are you feeling?

> . . . .

> She should have called a nursing supervisor. She shouldn't have let him go in the shower by himself. When he specifically asked for a razor, the red flag should have gone up.

> . . . .

> No. I certainly haven't allowed a patient to shave their [sic] own chest.

> . . . .

> Because—and particularly in this case, this guy has all these drugs on board in his system. Number 1, you know, the nurse knows where the leads need to be placed. You're going to let a guy with all these drugs be doing this number, shaving his chest? She should be concerned he is going to cut

21

himself. I have never allowed a patient to shave their [sic] own chest. The nurse does it for them[,] Nurse Munoz said the same thing.

Later, Nurse Frederick was shown the double-edged razor that Nurse Bergado provided to Hermes, and Nurse Frederick stated that she had not seen that type of razor used in a hospital setting in recent history and that she would not have given Hermes any type of razor. Nurse Frederick disagreed with Nurse Bergado's statements that the governing standard of care only required that she check in on Hermes about every hour. Nurse Frederick believed that, under the circumstances, Hermes needed to be monitored more closely.[18] Based on these factors, Nurse Frederick concluded that appellants failed to provide a safe environment for Hermes and ultimately created a situation that led to Hermes's demise.

Appellees also referenced deposition testimony by Nurse Munoz, who stated that it was "weird" that: (1) Hermes requested a razor under the circumstances; and (2) Nurse Bergado gave him the razor and left him alone. With regard to Hermes's request to shave his chest, Nurse Munoz noted that she would have helped him shave his chest rather than allow him to do it himself. Nurse Munoz also testified that Hermes's intense headaches, anxiety, and insomnia could have been symptoms of depression for which appellants apparently failed to consider or devise a neurological treatment plan. Nurse Munoz

_____

[18] Nurse Frederick also pointed out that Nurse Bergado did not even comply with the standard of care about which she opined because the record clearly reflects that from the time Hermes was given the double-edged razor until he died, neither Nurse Bergado nor any other nurse checked to see how Hermes was doing in the bathroom. The record only shows that Nurse Munoz briefly peered into Hermes's room at around 7:30 a.m., even though Hermes was in the bathroom with the door closed and locked. In fact, Nurse Munoz noted in Hermes's medical records that at 7:34 a.m., he was still in the shower.

Nurse Frederick also opined that the equipment used to monitor Hermes's heart regularly relayed information to the nurses' station about the condition of Hermes's heart and that Hermes's medical records reflected that he was off the heart monitor for several hours on the morning of April 19, which illustrates that no one was monitoring Hermes and that no one questioned why he was off his heart monitor for so long during the time he was in the shower.

22

acknowledged that if a hospital employee put a patient at risk for possible injury, then such an act would violate the applicable standard of care.

Appellees called a second expert witness, Gary Michael Glass, M.D., a board-certified psychiatrist, to testify about Hermes's mental state. Dr. Glass stated that the only reason the drug Lexapro would have been prescribed to Hermes would be for treatment of depression. Dr. Glass reviewed Hermes's medical records and concluded that the nurses at the hospital failed to do a thorough psycho-social assessment and that Hermes's symptoms were significant enough to require a mental-status examination, which apparently was not conducted while Hermes was hospitalized. With respect to the double-edged razor, Dr. Glass testified that Nurse Bergado's act in giving it to Hermes was "absolutely, one hundred percent inappropriate and dangerous, obviously." Dr. Glass further opined that:

> You have a man who had obvious psychiatric problems. He was admitted to the hospital with three diagnoses, two of which were psychiatric in nature. The neurological consultant said this isn't neurological, wait for the results, but look into psychiatry for the issues. He's on psychiatric medicines. Again, it is the nursing staff's responsibility to know the medicines. He's on an anti[-]depressant and he's on an anti[-]anxiety and he's on a sleep aid. We don't do that for a hangnail. Obviously, we do this for somebody who's anxious, depressed[,] and has trouble sleeping. The behavior itself has not been assessed. The gentleman took a shower earlier in the evening. He took extra doses of medication. Why on earth would he decide at 5:00 a.m., to want to shave his chest and take a shower. Now, conceivably there might be legitimate reasons. I doubt it, but there could be, but no one asked him. No one said, hey, wait a minute, this is a little odd, number one; number two, this man has been on these doses of medicines for a very short time and he's gotten an extra dose. Nurse Bergado doesn't know or certainly hasn't written that he's able to stand up, get around[,] and walk without falling over from these medicines. He's on a telemetry unit. He's paying a premium to be on a telemetry unit, because there is a consideration that there's a serious problem with his heart. . . . Nurse Bergado, without asking anybody or checking with anyone or certainly not recording that, simply takes this off [the telemetry leads] and says, go, go on into the shower.

. . . .

There's no oversight, there's no thought to this. Okay? . . . Unfortunately, we're dealing with suicide, but this man could have simply fallen and hit his head. He could have tripped, any number of things could have happened, separate and apart from suicide, that could have been very seriously harmful to him, all behind that locked door, with or without a razor.

. . . .

She [Nurse Bergado] took no pains, in fact, nobody on the staff took any pains to investigate what clearly was a serious psychiatric ailment, and, as a result, [Hermes is] dead.

Dr. Glass then noted that, in his opinion, had someone checked on Hermes while he was in the shower, he might still be alive today. Dr. Glass further noted that, in reasonable medical probability, if the applicable standard of care had been met in this case and had the razor not been provided by Nurse Bergado, Hermes would have survived the hospitalization and would have been treated for his psychiatric ailments.[19]

Dr. Bux, another expert witness called by appellees, testified as to how Hermes killed himself and concluded that, after reviewing Hermes's medical records, he was likely still alive as late as 8:15 a.m. on April 19. Dr. Bux noted that when Nurse Munoz allegedly peered into Hermes's room at 7:30 a.m., it was likely that Hermes was still alive and "most likely salvageable." Dr. Bux admitted on cross-examination that there is nothing in Hermes's medical records indicating that he had suicidal tendencies or that doctors had ordered that Hermes be restrained for protection from himself.

2.     **Appellants' Evidence**

On appeal, appellants argue that Hermes's injuries and death were not foreseeable

---

[19] Dr. Glass clarified that some, but not all, suicides are preventable, and that most people suffering from depression who receive treatment, "get better." Despite the fact that not all suicides are preventable, Dr. Glass testified that Hermes's suicide was preventable had appellants complied with the applicable standards of care.

24

and that the hospital's actions were not a substantial factor in causing Hermes's injuries and death. Appellants first direct us to the letter that Hermes gave to Diana prior to being hospitalized. Appellants contend that this letter conveyed Hermes's desperation about his mental state and that because Diana never revealed the contents of the letter, the hospital had no idea that Hermes was affected by mental illness. Essentially, appellants contend that Hermes and his family purposefully concealed his condition to hide any shame associated with Hermes's possible commitment in a mental institution. Further, appellants assert that Hermes denied being depressed at the hospital during an initial assessment in the emergency room and to Dr. Marvin Tavarez. Appellants direct us to Hermes's medical records, which are largely devoid of any documentation regarding any potential for mental illness. The only documentation in Hermes's medical records which may have suggested that Hermes was suffering from mental illness was a note by Dr. Yee recommending that Hermes undergo a psychiatric consultation. Appellants note, however, that Dr. Yee did not order any kind of suicide prevention, nor did he note that Hermes exhibited any signs of self-destruction. Appellants further assert that Hermes was interviewed by several doctors, including two neurologists, during his hospitalization and that none of the doctors documented any concern regarding depression or suicidal tendencies.[20]

Nurse Bergado testified via deposition that Hermes was generally calm and oriented during his hospitalization and that he was able to think, interact, and function. Nurse Bergado further testified that Hermes was alert, pleasant, and cooperative with the attending doctors and nurses. Nurse Bergado did not recall seeing Hermes exhibit any

---

[20] Appellants stated in their brief that Hermes was examined by four doctors and that two of them had experience with treating psychiatric patients; however, appellants do not explain which doctors had such experience, and Nurse Bergado testified that Dr. Yee is a "neuro doctor" and not a "psychiatric doctor."

violent, aggressive, or destructive behaviors, including "pulling out tubes, trying to climb over the side rails [of the bed]," when he was under her care. Nurse Bergado did admit that the fact that Dr. Yee recommended that Hermes undergo a "psychiatric consult" might indicate that Hermes had a "psychiatric problem." Nevertheless, Nurse Bergado acknowledged that she did not implement a plan to manage any potential neurological problems that Hermes might have, which included encouraging Hermes to express his feelings and providing "coping and support." Nurse Bergado did not believe that such a plan was necessary because Hermes was alert and oriented, highly intelligent, and he regularly expressed what he felt. Nurse Bergado explained that she did not check on Hermes while he was in the bathroom because he had told her that he would call her when he was finished. Regarding the razor, Nurse Bergado testified that the double-edged razor that Hermes received was the same type of razor that other hospital patients received and that she had provided other patients with razors in the past without supervising their usage.

Appellants called two expert witnesses—Dr. Marvin Tavarez and Jan A. Fawcett, M.D.—to testify on their behalf. Dr. Tavarez noted that he met Hermes at the emergency room on April 16. Dr. Tavarez, reading from Hermes's medical records, then testified that:

> This 41-year-old white male was sent to the hospital because of recurrence of severe headaches. His headaches had gotten so severe, especially in the past several days, three—to—four days, where he feels that he passes out and all of a sudden turns black. He had to grab onto something for a few seconds and then he feels better. He had not had, however, any apheresis, which means sweating with this. He has, however, noted upon close questioning that occasionally he will have some tachycardia, or fast heartbeat. Also[,] he has noticed his heart racing after he is in bed. This will be present for [a] few minutes and after which time becomes basically asymptomatic.
>
> . . . .

26

The patient also complained he has a sensation of air coming out of his left ear with certain movements. He has also noted that his headache is very severe, it is all over his head but mostly in the nuchal area, which is the back of the head. He had has headaches for many years[;] however, this has persisted and is getting worse to where his mental acuity has decreased. . . . The patient has had numerous studies done before in the past, had an MRI, CT scan of the brain, and everything has been normal, and this patient has been evaluated by Dr. Ruy Mireles and apparently no pathology.

Dr. Tavarez stated that Hermes was generally reluctant to take medication, even though he had requested Xanex to help him sleep in the early morning hours of April 19. Dr. Tavarez did the initial examination of Hermes and diagnosed him with "severe recurrent headaches, fatigue, fainting-like spells and questionable hyperventilation." At this time, Dr. Tavarez prescribed Hermes the anti-depressant Lexapro, which Dr. Tavarez admitted is used for "anxiety and depression." Dr. Tavarez denied ever seeing Hermes exhibit any behaviors that warranted suicide precautions.

On cross-examination, Dr. Tavarez acknowledged that Hermes likely "was alive" at 7:45 a.m. on April 19, which was shortly after Nurse Munoz purportedly peered into Hermes's room. When asked whether doctors ever came up with a diagnosis to explain Hermes's symptoms, Dr. Tavarez stated that doctors diagnosed Hermes with anxiety; however, Dr. Tavarez admitted that anxiety only explained a portion of Hermes's symptoms. Later, Dr. Tavarez testified that Hermes appeared to be responding well to the treatment provided and that he was scheduled to be released from the hospital later in the day on April 19. Dr. Tavarez noted that no doctor who observed Hermes ever diagnosed him as a risk to commit suicide and that Hermes denied being depressed.

Dr. Fawcett, a physician and psychiatrist who has worked at the National Institute of Mental Health and has studied suicide and depression for many years, testified that it

27

is very difficult to predict suicide. Dr. Fawcett opined that Hermes had anxiety attacks dating back to 1992, and that Xanex had been prescribed previously to treat Hermes's anxiety. Dr. Fawcett stated that Hermes was only given 0.25 milligrams of Xanex, a "geriatric dose," when treated at the hospital and that she usually prescribed patients with severe anxiety one or two milligrams of Xanex. In fact, Dr. Fawcett stated that the dosage of Xanex given to Hermes was the "lowest prescribable [sic] dose." She further stated that, after reviewing Hermes's medical records, it did not appear that Hermes exhibited a level of anxiety that would make a reasonable person suspect that he was a suicide risk. Dr. Fawcett then explained that headaches and difficulty in concentration are symptoms of both depression and obstructive sleep apnea and that Hermes had been previously diagnosed in August 2003, with possible sleep apnea. Dr. Fawcett later described the DSM4 test that is used by psychiatrists to measure depression:

> Well, I would like to just back up for a minute and tell the—I mentioned this a little bit. But it's very important in our society we say we're depressed when we feel bad, and that's not a depression. Depression has to meet certain criteria from that DSM4 that I mentioned. You have to either have severe—you have to have depressed mood for two weeks constantly or what's called inability to experience pleasure. That means when something happens, you win something but you don't feel any sense of pleasure from it, your kids no longer make you feel good. You don't enjoy the sunset anymore. You have no joy at all no matter what happens, even if good things happen. You have to have one or two of those symptoms to qualify for depression, for major depression and then you have to have five other symptoms in addition to that, which have to do with sleep and appetite and energy and hopelessness and suicidal thoughts and things like [that].

Dr. Fawcett did not see anything in Hermes's record indicating that he was depressed. Moreover, Dr. Fawcett testified that hospital nurses checked Hermes for depression every twelve hours and that no one, including doctors, Hermes's wife, and Hermes's mother, suspected that Hermes was suffering from depression.

Dr. Fawcett explained that Hermes was prescribed a low dose—10 milligrams—of Lexapro and that Lexapro is approved for "generalized anxiety disorder, which is a disorder that doesn't—the patient isn't depressed but has predominant recurring anxiety." Dr. Fawcett also recalled that neither of the two neurologists that examined Hermes noted that he looked anxious; instead, they noted that Hermes was calm. With regard to the Ambien, Dr. Fawcett testified that the Ambien that Hermes took was dissolved by his body within two-and-a-half hours and that Hermes did not have any level of Xanex in his blood at the time of his death. Finally, Dr. Fawcett stated that, based on her medical experience, she did not believe that Hermes's suicide was foreseeable and that "the hospital did what they could do. . . . [H]e [Hermes] wouldn't have told them anyway. But there's just no—he was determined to separate that out and keep that to himself."

On cross-examination, Dr. Fawcett admitted that Hermes likely had not "completely formed the idea of suicide" when he wrote the original letter to Diana on April 16; however, Dr. Fawcett believed that Hermes "was desperate" at that point.[21] On re-direct examination, Dr. Fawcett stated that it was not a breach of the applicable standard of care for Nurse Bergado to give Hermes the razor because he had successfully shaved with it the day before. She did admit, however, that Hermes was no longer going to be on the telemetry monitor; therefore, she implied that Nurse Bergado's explanation for giving Hermes the razor to shave his chest because the telemetry sensors were bothering him was not entirely believable.

### 3. Foreseeability

---

[21] Dr. Fawcett acknowledged that at no point in the April 16 letter to Diana did Hermes explicitly express an intent to commit suicide; however, Dr. Fawcett believed that Hermes, "a high functioning and intelligent attorney, successfully concealed the extent of his illness because of fear generated by his depressive delusions of doom."

Here, appellees' expert witnesses testified that Hermes's injuries and death were foreseeable because of the actions of appellants' employees. Specifically, appellees' expert witnesses stated that hospital employees failed to: (1) properly assess and treat Hermes's psychiatric illness; (2) monitor Hermes after he took several different medications that have a potentiating effect; (3) observe and assist Hermes in shaving his chest; and (4) check on Hermes frequently while he was in the shower. Further, appellees' expert witnesses testified that it was certainly foreseeable that Hermes would be injured in some way while he was unattended in the shower with a razor and under the influence of several drugs at one time. The parties do not dispute that Hermes committed suicide; however, appellees allege that the actions of hospital employees caused great danger to Hermes's well-being and, essentially, created a dangerous situation that led to Hermes's injuries and death. Clearly, in determining that appellants' employees breached the duty of care owed to Hermes and in awarding damages, the jury concluded that Hermes's injuries and death were foreseeable. We agree.

As noted earlier, the jury was only required to find that appellants could foresee a general danger, rather than the exact sequence of events that produced the harm. *See Harrison*, 70 S.W.3d at 785; *see also Walker*, 924 S.W.2d at 377. Moreover, the jury was not required to conclude that appellants could foresee the precise manner in which the injury to Hermes occurred once the dangerous situation was created by appellants' purported negligence. *See Travis*, 830 S.W.2d at 98. Thus, it was not incumbent upon the jury to conclude that appellants could foresee that, as a result of the creation of a dangerous situation, Hermes would commit suicide. *See Harrison*, 70 S.W.3d at 785; *see also Walker*, 924 S.W.2d at 377. Instead, the jury needed only to conclude that by: (1)

30

giving Hermes a doubled-edged razor to shave his chest despite the fact that the bathroom did not have a mirror; (2) failing to properly assess and treat Hermes's psychiatric condition; (3) failing to monitor the effects of the several different medications that Hermes was taking; (4) failing to consider that Hermes was suffering from severe headaches and anxiety which often caused him to become dizzy and unsteady; and (5) neglecting to check on Hermes while he was in the bathroom for approximately three hours, a person of ordinary intelligence could have anticipated that the purported negligent acts of appellants' employees would have caused great danger to Hermes's well-being. *See Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d at 478; *see also Harrison*, 70 S.W.3d at 785; *Walker*, 924 S.W.2d at 377.

On appeal, appellants ask us to re-weigh the evidence adduced at trial and arrive at a different conclusion or, in other words, substitute our judgment for that of the jury's. Appellants direct us to various portions of the testimony provided by Nurse Bergado and Doctors Tavarez and Fawcett that may contradict the testimony of appellees' expert witness and support appellants' contention that Hermes's injuries and death were not foreseeable. However, as stated above, the jury is the sole judge of the witnesses' credibility and the weight to be assigned to contrary evidence, and this court may not impose its own opinion to the contrary. *See City of Keller*, 168 S.W.3d at 819; *see also Arias*, 265 S.W.3d at 468. Given its verdict, the jury clearly believed the testimony provided by appellees' experts and rejected the testimony of appellants' witnesses.

In viewing the evidence in the light most favorable to the jury's verdict and crediting favorable evidence if a reasonable fact-finder could, and disregarding contrary evidence unless a reasonable fact-finder could not, we conclude that the negligent actions of

31

appellants' employees about which appellees complain created a dangerous situation that was detrimental to Hermes's well-being. *See Boys Club of Greater Dallas, Inc.*, 907 S.W.2d at 478; *see also Harrison*, 70 S.W.3d at 785; *Walker*, 924 S.W.2d at 377. Furthermore, because of the dangerous situation created by its employees, appellants should have anticipated that Hermes would sustain some type of injury as a result of the complained-of negligent actions committed by appellants' employees. *See Harrison*, 70 S.W.3d at 785; *Walker*, 924 S.W.2d at 377; *see also Travis*, 830 S.W.2d at 98.

### 4. Cause-In-Fact

Although the Texas Supreme Court has stated that "'the conduct of the defendant may be too attenuated from the resulting injuries to the plaintiff to be a substantial factor in bringing about the harm,'" *Providence Health Ctr. v. Dowell*, 262 S.W.3d 324, 329 (Tex. 2008) (quoting *Mason*, 143 S.W.3d at 799), we conclude, based on the facts of this case, that appellants' acts or omissions of: (1) failing to properly assess and treat Hermes's psychiatric condition and closely monitor the effects that the Xanex, Lexapro, and Ambien medications had on Hermes; (2) giving Hermes a doubled-edged razor of the type not commonly used in most hospitals to shave his chest by himself in the bathroom that did not have a mirror in which Hermes could view his progress; and (3) failing to check on Hermes for approximately three hours while he was in the shower were substantial factors in causing Hermes's injuries and death. Several witnesses testified that had appellants complied with the applicable standards of care in this case, Hermes would likely still be alive. *See Harrison*, 70 S.W.3d at 784; *see also Boys Clubs of Greater Dallas, Inc.*, 909 S.W.2d at 477. Appellees' expert witnesses testified that Hermes exhibited several symptoms typically associated with depression, yet appellants failed to examine the

32

possibility of depression. Based on the record before us, we believe that Hermes's death could have been prevented had appellants complied with the applicable standards of care.

Appellants, in determining that Hermes was not suffering from a psychiatric illness, argue that Hermes, a non-medical professional, stated that he was not depressed. However, Hermes's medical records indicate that Dr. Yee recommended that Hermes undergo a psychiatric consultation; no psychiatric consultation took place because appellants' employees believed that such a consultation was not necessary given that Hermes appeared to be "alert and orientated."

On appeal, appellants rely heavily on the supreme court's holding that evidence that demonstrates only that the defendant's alleged negligence did no more than furnish a condition that made the alleged injuries possible does not suffice to establish the cause-in-fact component of proximate cause. *See Mason*, 143 S.W.3d at 799. Based on our review of the record, appellants' employees did far more than simply furnish a condition that made Hermes's injuries possible. In relying on the supreme court's holding in *Mason*, appellants essentially argue that the sole transgression in this case is Nurse Bergado's giving Hermes a double-edged razor and leaving him alone to shave. *See id.*

Appellees alleged in their live pleading a system-wide failure on the part of appellants in diagnosing, assessing, and treating Hermes's psychiatric illness. In other words, appellees asserted that appellants engaged in a continuing pattern of negligent behavior that ultimately caused Hermes's injuries. Appellees argued that appellants ignored numerous "red flags" that signified that Hermes was suffering from some kind of psychiatric illness, failed to provide adequate treatment for that illness, and created an ongoing dangerous situation that endangered Hermes's well-being and ultimately caused

33

his injuries and death.

Clearly, with its verdict, the jury, after hearing the testimony of both parties' expert witnesses and reviewing the trial exhibits, determined that appellants' actions or omissions were a substantial factor in causing Hermes's injuries and death. *See Farley*, 529 S.W.2d at 756; *see also Pate*, 170 S.W.3d at 848. In considering the evidence in the light most favorable to the jury's verdict and crediting favorable evidence if a reasonable fact-finder could and disregarding contrary evidence unless a reasonable fact-finder could not, we conclude that the jury was reasonable in concluding that appellants' actions constituted a substantial factor or, in other words, were a cause-in-fact in bringing about Hermes's injuries and death. *See Crump*, 2010 Tex. LEXIS 616, at **28-29; *Mason*, 143 S.W.3d at 798; *see also Park Place Hosp.*, 909 S.W.2d at 511; *Kramer*, 858 S.W.2d at 400.

### 5.     Intervening and Superceding Causes

Nevertheless, appellants argue that Hermes's suicide was an intervening, superseding cause which negated any causation finding. Specifically, appellants contend that "'[w]here an action is brought under a wrongful death statute[,] the general rule is that suicide constitutes an intervening force which breaks the line of causation from the wrongful act to the death and therefore the wrongful act does not render defendant civilly liable.'" *Exxon Corp. v. Brecheen*, 526 S.W.2d 519, 523 (Tex. 1975) (quoting Annotation, *Civil Liability for Death by Suicide*, 11 A.L.R. 751 (1950)); *see Shell Oil Co. v. Humphrey*, 880 S.W.2d 170, 174 (Tex. App.–Houston [14th Dist.] 1994, writ denied).

The supreme court has recently stated that "[i]f the act or omission alleged to have been a new and independent cause is reasonably foreseeable at the time of the defendant's alleged negligence, the new act or omission is a concurring cause as opposed

34

to a superseding or new and independent cause." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 857 (Tex. 2009) (citing *Dew v. Crown Derrick Erectors, Inc.*, 208 S.W.3d 448, 451 (Tex. 2006) (plurality opinion)). "A new and independent cause alters the natural sequence of events, produces results that would not otherwise have occurred, is an act or omission not brought into operation by the original wrongful act of the defendant, and operates entirely independently of the defendant's allegedly negligent act or omission." *Id.* (citing *Dew*, 208 S.W.3d at 451). In analyzing whether an intervening cause is new and independent, rather than superceding, the supreme court has applied the various factors set forth in section 442 of the Restatement (Second) of Torts, which provide:

> (a) the fact that its intervention brings about harm different in kind from that which would otherwise have resulted from the actor's negligence;
>
> (b) the fact that its operation or the consequences thereof appear after the event to be extraordinary rather than normal in view of the circumstances existing at the time of its operation;
>
> (c) the fact that the intervening force is operating independently of any situation created by the actor's negligence, or, on the other hand, is or is not a normal result of such a situation;
>
> (d) the fact that the operation of the intervening force is due to a third person's act or to his failure to act;
>
> (e) the fact that the intervening force is due to an act of a third person that is wrongful toward the other and as such subjects the third person to liability to him; [and]
>
> (f) the degree of culpability of a wrongful act of a third person which sets the intervening force in motion.

*Id.* (citing RESTATEMENT (SECOND) OF TORTS § 442 (1965)); *see Humble Oil & Ref. Co. v. Whitten*, 427 S.W.2d 313, 315 (Tex. 1968) (adopting the section 442 factors); *see also*

35

*Cowart v. Kmart Corp.*, 20 S.W.3d 779, 784 (Tex. App.–Dallas 2000, pet. denied).

On the other hand, Texas courts have held that more than one action may be the proximate cause of the same injury. *Wilson v. Brister*, 982 S.W.2d 42, 44 (Tex. App.–Houston [1st Dist.] 1998, pet. denied) (citing *Brookshire Bros., Inc. v. Lewis*, 911 S.W.2d 791, 793 (Tex. App.–Tyler 1995, writ denied)). The negligence of one does not excuse the negligence of another and where both the actor's negligent conduct and that of a third person bring about the injury, the rule of concurrent causation applies. *Id.* (citing *Atchison v. Tex. & Pac. Ry.*, 143 Tex. 466, 186 S.W.2d 228, 231 (1945); *Lewis*, 911 S.W.2d at 793; RESTATEMENT (SECOND) OF TORTS § 439 (1977)). The rule of concurrent causation provides that all persons who contribute to the injury are liable. *Id.* (citing *Berry Prop. Mgmt., Inc. v. Bliskey*, 850 S.W.2d 644, 655 (Tex. App.–Corpus Christi 1993, writ dism'd by agr.)). "The intervention of an unforeseen cause of injury does not necessarily mean there is a new and independent cause of such character as to constitute a superceding cause which will relieve a defendant from liability." *Brownsville Med. Ctr. v. Gracia*, 704 S.W.2d 68, 73 (Tex. App.–Corpus Christi 1985, writ ref'd n.r.e.). The intervening cause of the plaintiff's injury, even if unforeseeable, may be a concurring cause if the chain of causation flowing from the defendant's original negligence is continuous and unbroken. *Wilson*, 982 S.W.2d at 44 (citing *Bell v. Campbell*, 434 S.W.2d 117, 122 (Tex. 1968); *Henry v. Houston Lighting & Power Co.*, 934 S.W.2d 748, 753 (Tex. App.–Houston [1st Dist.] 1996, writ denied)); *see Gracia*, 704 S.W.2d at 73.

On appeal, appellants urge us to apply the section 442 factors of the Restatement (Second) of Torts to conclude that Hermes's suicide was an intervening and superseding

36

cause of the injuries alleged in this case.[22] However, we have already concluded that the record established that Hermes's injuries and death were foreseeable. Therefore, in applying supreme court precedent, Hermes's suicide, at best, would be considered a concurrent cause. *See Hawley*, 284 S.W.3d at 857; *see also Dew*, 208 S.W.3d at 451 (stating that "[a] new and independent cause is one that intervenes between the original wrong and the final injury such that the injury is attributed to the new cause rather than the first and more remote cause" and that a superseding cause can be distinguished from a concurrent cause if the injury that is the intervening force is both unforeseeable and its consequences are unexpected, meaning it produces results that would not otherwise have occurred); *Robert R. Walker, Inc. v. Burgdorf*, 150 Tex. 603, 244 S.W.2d 506, 509 (1951). Thus, we do not believe that Hermes's suicide "'operated entirely independently'" of the ongoing negligent actions of appellants' employees so that the suicide may be construed as superseding. *See Dew*, 208 S.W.3d at 451 (quoting 1 J.D. LEE & BARRY A. LINDAHL,

---

[22] If we were to rigidly apply the factors set forth in section 442 of the Restatement (Second) of Torts, as appellants urge, we conclude that the application of the factors to the evidence in the record do not yield a finding that Hermes's suicide was an intervening and superceding cause. *See Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 857-58 (Tex. 2009); *see also* RESTATEMENT (SECOND) OF TORTS § 442 (1965). First, appellants have not argued how subparts (d) through (f) are applicable in this matter; in fact, appellants acknowledge in their brief that these subparts apply only to the actions of third partes, and this matter does not involve the intervening actions of third parties. *See* RESTATEMENT (SECOND) OF TORTS § 442(d)-(f). Therefore, the only remaining applicable subparts would be (a) through (c). *See id.* § 442(a)-(c). With regard to subpart (a), we cannot say that Hermes's suicide brought about a harm different from that which would have otherwise resulted from the negligence of appellants' employees because Hermes presented himself with several psychiatric symptoms; Hermes was prescribed medication typically given to treat depression; appellants' employees failed to assess Hermes's psychiatric condition in light of Dr. Yee's recommendation for a psychiatric consultation; appellants' employees failed to properly monitor the effects the medications had on Hermes's well-being; and appellants' employees gave Hermes a double-edged razor and left him alone in a bathroom without a mirror to shave his chest for approximately three hours. *See id.* § 442(c). Given these circumstances, a person of ordinary intelligence could have foreseen that Hermes would be injured and could possibly commit suicide. *See Doe v. Boys Clubs of Greater Dallas*, Inc., 907 S.W.2d 472, 478 (Tex. 1995). As a result, appellants cannot say that subpart (b) was satisfied because Hermes's suicide was not extraordinary given the circumstances. *See* RESTATEMENT (SECOND) OF TORTS § 442(b). Finally, the negligent actions of appellants' employees were ongoing and ultimately caused Hermes's injuries and death; thus, Hermes's suicide flowed from the negligence of appellants' employees. As such, subpart (c) is not satisfied because Hermes's suicide is not an independent force, and it cannot be said conclusively that the suicide is not a normal result of the ongoing negligent treatment of what could be considered a psychiatric patient—Hermes—by appellants' employees. *See id.* § 442(c).

MODERN TORT LAW § 4:7 at 4-14-4-15 (2d ed. 2002)); *see also Hawley*, 284 S.W.3d at 859 ("[W]here the risk resulting from the intervening act is the same risk resulting from the original actor's negligence, the intervening act cannot be classified as a superseding cause."). Thus, because appellants contributed to Hermes's demise, they cannot escape liability in this case. *See Dew*, 208 S.W.3d at 450.

Additionally, appellants rely on the *Humphrey* case out of the Houston Fourteenth Court of Appeals to support its contention that Hermes's suicide was an intervening and superceding cause. While the *Humphrey* court did mention the general proposition of law that suicide constitutes an intervening force, breaking the line of causation, the court further explained that:

> Where the wrongful act, however, produces a rage or frenzy that the person injured by defendant's wrongful act destroys himself during such rage or frenzy, or in response to an uncontrollable impulse, the act is . . . considered as within and a part of the line of causation from defendant's wrongful act to the suicide and defendant's act is held to be the proximate cause of the death.

880 S.W.2d at 174 (internal citations and quotations omitted). The *Humphrey* court also referenced section 323 of the Second Restatement of Torts, which provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking if[:]
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

*Id.* at 176 (quoting RESTATEMENT (SECOND) OF TORTS § 323 (1965)).

We find these statements to be noteworthy because appellants have argued at trial

38

and on appeal that Hermes likely was contemplating suicide prior to hospitalization; thus, according to appellants, Hermes ostensibly had latent suicidal ideations. Such an argument is not persuasive because, assuming this argument is true, appellants' ongoing negligent actions directed towards Hermes triggered the so-called latent suicidal ideations and therefore caused Hermes to commit suicide. In addition, the record establishes that the negligent actions of appellants' employees increased the risk of harm to Hermes, and Hermes relied upon appellants to treat his ailments. *See Humphrey*, 880 S.W.2d at 176; *see also* RESTATEMENT (SECOND) OF TORTS § 323. Therefore, based on the foregoing, appellants should not be allowed to escape liability for causing Hermes's injuries and death. *See Humphrey*, 880 S.W.2d at 174, 176; *see also* RESTATEMENT (SECOND) OF TORTS § 323. We therefore conclude that Hermes's act of committing suicide does not rise to the level of intervening and superceding cause; instead, this act constitutes a concurrent cause that does not absolve appellants of liability in this matter. *See Hawley*, 284 S.W.3d at 857; *Dew*, 208 S.W.3d at 451; *see also Gracia*, 704 S.W.2d at 73.

Based on the foregoing, we conclude that the evidence supporting the jury's verdict is legally sufficient. *See City of Keller*, 168 S.W.3d at 822, 827. Accordingly, we overrule appellants' first three issues on appeal.

### III. THE AFFIRMATIVE DEFENSE OF SUICIDE AND APPELLEE'S CROSS-ISSUE AS TO PROPORTIONATE RESPONSIBILITY

In their fourth issue, appellants argue that the jury's verdict is not supported by legally sufficient evidence because appellants established the affirmative defense of suicide as a matter of law. Specifically, appellants complain about the jury's implicit rejection of its suicide affirmative defense. Appellees contend that the jury should not have

been allowed to consider Hermes's conduct of committing suicide because his suicide was caused by appellants' failure to comply with applicable legal standards. By their first cross-issue, appellees argue that the trial court erred in allowing the jury to consider Hermes's proportionate responsibility in causing his own death because appellants' section 93.001 affirmative defense may not be applied given that appellants failed to comply with applicable legal standards and "section 93.001 unambiguously and expressly trumps application of section 33.001." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 33.001 (Vernon 2008).

## A. Applicable Law

Section 93.001(a)(2) of the civil practice and remedies code provides that it is an affirmative defense to a civil action for damages for personal injury or death if the plaintiff, at the time the cause of action arose, was:

> committing or attempting to commit suicide, and the plaintiff's conduct in committing or attempting to commit suicide was the sole cause of the damages sustained; *provided, however, if the suicide or attempted suicide was caused in whole or in part by a failure on the part of any defendant to comply with an applicable legal standard, then such suicide or attempted suicide shall not be a defense.*

TEX. CIV. PRAC. & REM. CODE ANN. § 93.001(a)(2) (emphasis added). Texas Rule of Civil Procedure 94 requires that an affirmative defense be pleaded. TEX. R. CIV. P. 94. The burden of pleading and proving the elements of an affirmative defense is on the party seeking to rely on that defense. *See id.*; *Quantum Chem. Corp. v. Toennies*, 47 S.W.3d 473, 481 (Tex. 2001); *Compass Bank v. MFP Fin. Servs., Inc.*, 152 S.W.3d 844, 851 (Tex. App.–Dallas 2005, pet. denied); *see also West v. Hamilton*, No. 07-07-0235-CV, 2008 Tex.

40

App. LEXIS 7694, at **4-5 (Tex. App.–Amarillo Oct. 9, 2008, no pet.). To conclusively prove an affirmative defense, a party must have "'so conclusively proved each element of [that] affirmative defense . . . that there was no fact question to submit to the jury on any of its elements.'" *Kupchynsky v. Nardiello*, 230 S.W.3d 685, 697 (Tex. App.–Dallas 2007, pet. denied) (quoting *Brown v. Zimmerman*, 160 S.W.3d 695, 702 (Tex. App.–Dallas 2005, no pet.)). "A matter is conclusively established if ordinary minds could not differ as to the conclusion to be drawn from the evidence." *Id.* A party is not entitled to a jury issue on its affirmative defense unless it pleads and proves it. *Tricon Tool & Supply, Inc. v. Thumann*, 226 S.W.3d 494, 501 (Tex. App.–Houston [1st Dist.] 2006, pet. denied) (citing *Freeman v. Carroll*, 499 S.W.2d 668, 670 (Tex. Civ. App.–Tyler 1973, writ ref'd n.r.e.)).

If an appellant challenges the legal sufficiency of an adverse finding on an issue on which it had the burden of proof—here, the affirmative defense of suicide—it must demonstrate on appeal that the evidence conclusively established all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001); *accord Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 340 (Tex. 1998); *see Thumann*, 226 S.W.3d at 501. In reviewing such a matter-of-law challenge, we employ a two-part test. *See Pac. Employers Inc. Co. v. Dayton*, 958 S.W.2d 452, 455 (Tex. App.–Fort Worth 1997, pet. denied) (citing *Victoria Bank & Trust Co. v. Brady*, 811 S.W.2d 931, 940 (Tex. 1991)). First, we examine the record for evidence supporting the finding, while ignoring all evidence to the contrary. *See Dow Chem. Co.*, 46 S.W.3d at 241. If there is not any evidence to support the finding, the reviewing court examines the entire record to determine whether the contrary proposition is established as a matter of law. *See id.* If the contrary proposition is established conclusively, then the evidence supporting the jury's decision is

41

legally insufficient and appellant's issue is sustained.  *See id.*

## B.    Appellants' Suicide Affirmative Defense

Here, appellants assert that the jury should have rendered a take-nothing verdict because Hermes committed suicide and their actions were not the cause of Hermes's suicide.  We have already concluded that the jury's determination that appellants engaged in an ongoing pattern of negligent behavior that endangered Hermes's well-being and caused Hermes's injuries and death was supported by legally sufficient evidence.  Because of this conclusion, we cannot say that appellants have sustained their burden of conclusively establishing all vital facts in support of their suicide affirmative defense.  *See Dow Chem. Co.*, 46 S.W.3d at 241; *Martinez*, 977 S.W.2d at 340; *see also Thumann*, 226 S.W.3d at 501.  Moreover, section 93.001(a)(1) itself states that suicide "shall not be a defense" if "the suicide or attempted suicide was caused in whole or in part by a failure on the part of any defendant to comply with an applicable legal standard."  TEX. CIV. PRAC. & REM. CODE ANN. § 93.001(a)(2); *see Alvarado v. City of Brownsville*, 865 S.W.2d 148, 153-154 (Tex. App.–Corpus Christi 1993), *rev'd on other grounds*, 897 S.W.2d 750 (Tex. 1995). Therefore, based on the foregoing, we reject appellants' contention that the jury's verdict is not supported by legally sufficient evidence because they established their suicide affirmative defense as a matter of law.  *See id.*; *see also Dow Chem. Co.*, 46 S.W.3d at 241; *Martinez*, 977 S.W.2d at 340; *Thumann*, 226 S.W.3d at 501.  Accordingly, we overrule appellants' fourth issue.

## C.    Hermes's Proportionate Responsibility

Proportionate responsibility under chapter 33 of the civil practice and remedies code provides that "a claimant may not recover damages if his percentage of responsibility is

greater than 50 percent." Tex. Civ. Prac. & Rem. Code Ann. § 33.001. Chapter 33 applies to "any cause of action based in tort in which a defendant, settling person, or responsible third party is found responsible for a percentage of the harm for which relief is sought." *Id.* § 33.002(a)(1) (Vernon 2008). Further, in determining the percentage of responsibility, the trier of fact must also consider, among other things, the responsibility of the claimant and other responsible third parties in causing or contributing in any way to the harm for which the recovery of damages is sought. *Id.* § 33.003(a).

On appeal, appellees argue that the jury improperly considered whether Hermes's actions constituted "negligence aside from the very act of committing suicide."[23] The record reflects that Hermes believed he had descended into madness and that he made a "weird" request to shower and shave at 5:00 a.m. on April 19, even though he had showered twice before in the previous seventeen hours. Several expert witnesses testified that Hermes had a psychiatric condition that appellants neglected to properly assess and treat. However, prior to committing suicide, Hermes left a suicide note, which suggests that Hermes may have considered and contemplated suicide at some point before he actually carried it out.

The supreme court has stated that a jury may "consider the conduct of [a] patient when determining proportionate responsibility as a part of an inclusive comparative negligence scheme rather than compartmentaliz[ing] negligence in rigid categories." *Jackson v. Axelrad*, 221 S.W.3d 650, 654 (Tex. 2007); *see Dowell*, 262 S.W.3d at 333

---

[23] Appellants argue that appellees waived this cross-issue because they improperly raised this cross-issue in their appellee's brief rather than the separate brief filed for the their cross-appeal. However, the supreme court has held that we are to construe the briefing rules "reasonably, but liberally, when possible so that the right to appeal is not lost . . . ." *Jamar v. Patterson*, 868 S.W.2d 318, 319 (Tex. 1993) (per curiam); *see San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 338 (Tex. App.–Houston [14th Dist.] 2005, no pet.). In any event, given our resolution of appellees' proportionate responsibility cross-issue, we need not address appellants' waiver argument. *See* Tex. R. App. P. 47.1.

43

(Wainwright, J., concurring); *see also* TEX. CIV. PRAC. & REM. CODE ANN. §§ 33.001-.003.

In *Dowell*, the decedent, Lance, a nineteen-year-old male, was admitted for treatment at a local hospital after threatening to kill himself. 262 S.W.3d at 325. Lance was distraught over his girlfriend threatening to leave him. *Id.* at 325-26. He had made similar threats in the past and had been previously admitted to the hospital for treatment. *Id.* While at the hospital, nurses and doctors failed to make a comprehensive assessment of Lance's risk of suicide. *Id.* at 326. Lance told doctors that he was not suicidal, and, because he was an adult and did not desire to be hospitalized, doctors released him pursuant to a no-suicide contract, which provided that Lance would go to the local Mental Health and Mental Retardation Center ("MHMR") for assessment and stay with his family until the assessment was completed. *Id.* at 326-27. Lance agreed, and the hospital discharged him shortly thereafter. *Id.* at 327. After being discharged, Lance went to a family reunion and attended a rodeo with his brother. *Id.* However, thirty-three hours after being discharged and not having visited the local MHMR center, Lance hung himself. *Id.*

The jury found that the hospital was negligent and assessed $400,000 in damages for Lance's parents and $400,000 in damages for Lance's estate. *Id.* at 327-28. The court of appeals affirmed the jury's verdict. *Id.* at 328. However, the supreme court reversed, holding that Lance could not have been hospitalized against his will given the circumstances and that the hospital's discharge of Lance did not proximately cause his death. *Id.* at 328-30. The majority opinion did not discuss the interplay between chapter 33 and section 93.001 of the civil practice and remedies code.[24]

---

[24] The jury did not conclude that Lance was proportionally responsible for his own suicide; instead, the jury determined that two health care providers and an emergency room physician were responsible for Lance's suicide. *Providence Health Care v. Dowell*, 262 S.W.3d 324, 327-28 (Tex. 2008).

In a concurrence, Justice Wainwright, however, did consider the interplay between those statutory provisions and noted that "[i]f [the decedent's] actions apart from the act of committing suicide violated an applicable standard of care (such as negligence), a jury should have weighed such actions in assigning proportionate responsibility." *Id.* at 332 (Wainwright, J., concurring). Justice Wainwright noted that a jury could have concluded that Lance failed to follow the no-suicide contract and that the failure to follow that contract contributed to his death; therefore, Justice Wainwright concluded that Lance engaged in actions apart from the actual commission of suicide that were negligent and, thus, partially caused the complained-of injuries. *Id.* (Wainwright, J., concurring). Under these circumstances, Justice Wainwright determined that the jury could have been instructed about the proportionate responsibility statutes. *Id.* at 332-33 (Wainwright, J., concurring).

On the other hand, Justice O'Neill's dissent in *Dowell* pointed out that to "attribute causation for breach of a mental health standard of care to the patient whose undiagnosed mental impairment was the very cause of injury" would be "clearly contrary to the statute's [section 93.001(a)(2)] intent." *Id.* at 337 (O'Neill, J., dissenting). Justice O'Neill also stated that Justice Wainright's suggestion that the jury consider negligent actions taken by the decedent apart from committing suicide was untenable because:

> Under such an approach, a fact[-]finder would have to somehow separate Lance's suicide from the events leading to his suicide. However, I find it unlikely that, in drafting the statute, the Legislature intended parties who breached the standard of care to be absolved from liability because the act of isolating one's self in order to commit suicide is somehow separable from the act of suicide itself. Notwithstanding the difficulties inherent in requiring the fact[-]finder to divorce actions leading to suicide from the actual event, there is no factual support for such a submission in this case.

*Id.* at 336 (O'Neill, J., dissenting).

45

We agree with Justice O'Neill's analysis as applied in this case because the negligent actions of appellants' employees were ongoing and Hermes's suicide flowed from those actions. Moreover, it is noteworthy that Hermes committed suicide while still in the care of appellants' employees, not thirty-three hours after being released by a health care provider. *See id.* at 325. Because of the ongoing nature of the negligence, it would be extremely difficult for the jury to divorce Hermes's suicide from the events leading to his suicide. *See id.* at 336 (O'Neill, J., dissenting). Furthermore, we agree that the submission of a question to the jury regarding Hermes's proportionate responsibility circumvents section 93.001(a)(2), which provides that the affirmative defense of suicide may not be asserted if the defendant breaches an applicable legal duty and causes the suicide in whole or in part. *See id.*; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 93.001(a)(2). For example, if the jury had concluded that Hermes was 51% responsible for the complained-of injuries and that appellants were 49% responsible, appellants would not be allowed to assert the affirmative defense of suicide because they were 49% negligent or, in other words, were negligent in part in causing the suicide. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 93.001(a)(2). However, in such an event, Hermes would be precluded from recovering, despite the jury's conclusion that appellants were 49% negligent in the matter, because his negligence exceeded 50%. *See id.* § 33.001. Essentially, appellants would be insulated from liability and ostensibly given a second chance at asserting suicide as an affirmative defense if Hermes's proportionate responsibility is submitted, both of which contravene the Legislature's intent in promulgating chapter 33 and section 93.001(a)(2). *See Dowell*, 262 S.W.3d at 336 (O'Neill, J., dissenting).

Regardless of which approach is applied in this matter, we arrive at the same

conclusion. There is no evidence that Hermes took any "actions apart from the act of committing suicide" that violated an applicable standard of care. *See id.* at 332. Nurse Bergado and Doctor Tavarez both testified that Hermes was "alert and oriented" and followed their instructions for treatment. *See Jackson*, 221 S.W.3d at 654 (holding that a patient has a duty to cooperate with treating physicians, including cooperating in both diagnosis and treatment); *see also Elbaor v. Smith*, 845 S.W.2d 240, 245 (Tex. 1992) (same). Moreover, there is no evidence in the record clearly expressing Hermes's thoughts regarding the suicide; therefore, we cannot be certain whether Hermes's suicide was an intentional act or solely the result of Hermes's descent into madness that was partially caused by the negligence of appellants' employees; or, in other words, we cannot separate Hermes's suicide from the events leading to his suicide. *See Dowell*, 262 S.W.3d at 334 (O'Neill, J., dissenting) (citing *Int'l & Great N. R.R. Co. v. White*, 103 Tex. 567, 131 S.W. 811, 812 (1910) (holding that a witness may not testify as to what a deceased person would have done because such testimony is mere speculation)).

Therefore, based on the foregoing, we would conclude that it was error to submit Hermes's proportionate responsibility once the jury rejected appellants' suicide affirmative defense. *See* TEX. R. CIV. P. 277 (requiring that apportionment questions be submitted to the jury in broad form); *see also Romero v. KPH Constr., Inc.*, 166 S.W.3d 212, 215 (Tex. 2005) ("But broad-form submission [of apportionment questions] cannot be used to put before the jury issues that have no basis in the law or the evidence."). Despite this conclusion, appellees have not adequately explained how the submission of Hermes's proportionate responsibility harmed them. *See* TEX. R. APP. P. 38.1(i), 44.1. Specifically, appellees have failed to explain how the jury's damage award and proportionate

47

responsibility calculations would change given the erroneous submission of Hermes's proportionate responsibility. Without clearly articulating the harm caused by the improper submission, we cannot conclude that the jury's verdict was improper. *See Dowell*, 262 S.W.3d at 331 (Wainwright, J., concurring) (stating that "[a] reviewing court may reverse and remand for a new trial based on alleged error in a jury charge only if such error was reasonably calculated and probably did cause the rendition of an improper judgment") (internal quotations omitted) (citing *Sterling Trust Co. v. Adderley*, 168 S.W.3d 835, 843 (Tex. 2005); *Reinhart v. Young*, 906 S.W.2d 471, 473 (Tex. 1995); *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex. 1986)). Accordingly, we overrule appellees' first cross-issue.

### IV. SECTIONS 74.301 AND 74.303—THE STATUTORY DAMAGE CAPS

By their second cross-issue, appellees argue that the trial court erroneously imposed the damage cap of $250,000, as provided in section 74.301(b) of the civil practice and remedies code, as opposed to the damage cap found in section 74.303. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.301(b), .303. Specifically, appellees assert that because their claims are wrongful death and survival actions based on a health care liability claim, section 74.303 rather than section 74.301(b), the damage cap applicable to ordinary health care liability claims, applies. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.301(b), .303. Appellants counter by arguing that the trial court correctly applied the $250,000 non-economic damage cap of section 74.301(b). *See id.* § 74.301(b). Appellants further argue that the plain language and legislative history of section 74.301(b) prove that the $250,000 non-economic damage cap applies to all health care liability actions, including wrongful death actions. *See id.*

48

## A.    Standard of Review

In analyzing appellees' second cross-issue, we must resort to the rules of statutory interpretation.  Matters of statutory interpretation are questions of law, over which we exercise de novo review.  *Tex. Dep't of Transp. v. Needham*, 82 S.W.3d 314, 318 (Tex. 2002).  The primary rule of statutory construction is that a court must look to the intent of the Legislature and must construe the statute so as to give effect to that intent.  *See* TEX. GOV'T CODE ANN. § 312.005 (Vernon 2005); *see also Lee-Hickman's Invs. v. Alpha Invesco Corp.*, 139 S.W.3d 698, 700 (Tex. App.–Corpus Christi 2004, no pet.) (per curiam) (citing *City of Austin v. L.S. Ranch, Ltd.*, 970 S.W.2d 750, 752 (Tex. App.–Austin 1998, no pet.)).  It is a rule of statutory construction that every word of a statute must be presumed to have been used for a purpose, and each sentence, clause, and word is to be given effect if reasonable and possible.  *See Tex. Workers' Comp. Ins. Fund v. Del Indus., Inc.*, 35 S.W.3d 591, 593 (Tex. 2000) (citing *Perkins v. State*, 367 S.W.2d 140, 146 (Tex. 1963)); *see also Cameron v. Terrell & Grant, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981).  Likewise, every word excluded from a statute must also be presumed to have been excluded for a purpose.  *See Cameron*, 618 S.W.2d at 540.  In addition, we do not view disputed portions of a statute in isolation.  *Del Indus., Inc.*, 35 S.W.3d at 593 (citing *Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132, 133 (Tex. 1994)).  We are to discern legislative intent from the plain meaning of the words of the statute.  *See Alpha Invesco Corp.*, 139 S.W.3d at 700 (citing *L.S. Ranch, Ltd.*, 970 S.W.2d at 752).

## B.    Applicable Law

Section 74.301(b) provides that:

In an action on a health care liability claim where final judgment is rendered

against a single health care institution, the limit of civil liability for non[-]economic damages inclusive of all persons and entities for which vicarious liability theories may apply, shall be limited to an amount not to exceed $250,000 for each claimant.

TEX. CIV. PRAC. & REM. CODE ANN. § 74.301(b).  On the other hand, section 74.303 states that:

(a) In a wrongful death or survival action on a health care liability claim where final judgment is rendered against a physician or health care provider, the limit of civil liability for all damages, including exemplary damages, shall be limited to an amount not to exceed $500,000.00 for each claimant, regardless of the number of defendant physicians or health care providers against whom the claim is asserted or the number of separate causes of action on which the claim is based.

(b) When there is an increase or decrease in the consumer price index with respect to the amount of that index on August 29, 1977, the liability limit described in Subsection (a) shall be increased or decreased, as applicable, by a sum equal to the amount of such limit multiplied by the percentage increase or decrease in the consumer price index, as published by the Bureau of Labor Statistics of the United States Department of Labor, that measures the average changes in prices of goods and services purchased by urban wage earners and clerical workers' families and single workers living alone (CPI-W:  Seasonally adjusted U.S. City Average-All items), between August 29, 1977, and the time at which damages subject to such limits are awarded by final judgment or settlement.

(c) Subsection (a) does not apply to the amount of damages awarded on a health care liability claim for the expenses of necessary medical, hospital, and custodial care received before judgment or required in the future for treatment of the injury.

*Id.* § 74.303(a)-(c).

The crux of this issue is whether what seems to be the more general provision, section 74.301(b), or the more specific provision, section 74.303, applies.  *See Horizon/CMS Healthcare Corp. v. Auld*, 34 S.W.3d 887, 901 (Tex. 2000) (determining that the judgment cap provisions of section 11.02 of former article 4590i prevail over the general pre-judgment interest provisions of article 5069-1.05); *cf.* TEX. GOV'T CODE ANN.

§ 311.026 (Vernon 2005) (providing that, when construing code provisions that are irreconcilable, "the special or local provision prevails as an exception to the general provision, unless the general provision is the later enactment and the manifest intent is that the general provision prevail"). On appeal, neither party cites any case law addressing the interplay between sections 74.301(b) and 74.303; however, in researching this issue, we were able to find one case from the Amarillo Court of Appeals addressing this precise issue. *See THI of Tex. at Lubbock I, LLC v. Perea*, No. 07-08-0359-CV, 2010 Tex. App. LEXIS 5980, at **90-103 (Tex. App.–Amarillo July 28, 2010, no pet. h.).[25]

In *Perea*, the appeals court stated the following:

> We find no cases which directly decide this issue [the interplay between sections 74.301(b) and 74.303]. However, because the two statutory provisions do not conflict on their face, in order to give full effect to the intent of the Legislature, we see no reason why one cap should apply to the exclusion of the other cap. Neither the express wording of the applicable statutes, nor their legislative history indicates that the Legislature intended anything other than to apply both caps. Therefore, we conclude that both caps can be applied, and should be applied.

*Id.* at **97-98.

The plain language of section 74.301(b) limits a health care provider's civil liability for *non-economic damages* at $250,000 per claimant, while section 74.303 limits the health care provider's *total civil liability*, including economic and non-economic damages but excluding "necessary medical, hospital, and custodial care" costs, at $500,000 per claimant. We agree that both section 74.301(b) and section 74.303 can and should be applied together. *See id.* at **97-98.

---

[25] In all fairness, the Amarillo Court of Appeals's decision in *THI of Texas at Lubbock I, LLC v. Perea*, was handed down on July 28, 2010, and the parties' briefs arguing this cross-issue were filed in May and August 2009. *See* No. 07-08-0359-CV, 2010 Tex. App. LEXIS 5980, at **90-103 (Tex. App.–Amarillo July 28, 2010, no pet. h.).

In any event, appellees have not argued that the statutes are in conflict. Instead, they argue that, by including the "wrongful death and survival action on a health care liability claim," the Legislature intended to apply the section 74.303 cap to such claims, while the section 74.301(b) cap applies to "common[-]law negligence health care liability claims." In applying section 74.303, as explained by appellees, the trial court's damage award should have been $1,788,325 rather than $728,980.98.[26] We disagree. Because sections 74.301(b) and 74.303 can and should be read together, *see id.* at **97-98, we cannot say that section 74.303 applies solely to the exclusion of section 74.301(b) in this case. Furthermore, appellees have not cited to any authority directly on point.

In addition, several commentators, after reviewing the statutes and transcripts of the hearings on the Tort Reform Act of 2003, commonly known as House Bill 4, have expressed that the Legislature intended for "the wrongful death cap" to be "an aggregate cap on all damages. Thus, section 74.303 will apply secondarily to any cap on non-economic damages. Therefore, any damage award will be limited by applying the non-

[26] In its damages award, the jury awarded the following:

1. Diana: $123,000 in economic damages; $800,000 for past and future loss of companionship and society; and $750,000 for past and future mental anguish for a total of $1.55 million in non-economic damages;

2. Sarah: $87,000 in economic damages; $1 million for past and future loss of companionship and society; and $1 million for past and future mental anguish for a total of $2 million in non-economic damages.

3. Lauren: $87,000 in economic damages; $1 million for past and future loss of companionship and society; and $1 million for past and future mental anguish for a total of $2 million in non-economic damages.

4. Alejandro: $87,000 in economic damages; $1 million for past and future loss of companionship and society; and $1 million for past and future mental anguish for a total of $2 million in non-economic damages.

5. Hermelinda: $100,000 in past and future economic damages; $500,000 for past and future loss of companionship and society; and $500,000 for past and future mental anguish for a total of $1 million in non-economic damages.

economic damage cap in section 74.301, and then will further be limited by applying the total cap of section 74.303." Jeff Watters, *Better to Kill than to Maim: The Current State of Medical Malpractice Wrongful Death Cases in Texas*, 60 BAYLOR L. REV. 749, 760 (2008); *see* Michael S. Hull et al., *House Bill 4 and Proposition 12: An Analysis with Legislative History, Part Three*, 36 TEX. TECH L. REV. 169, 175, 243 n.464 (2005) (stating, after consulting with Former Chairman of the Texas Senate Robert L. Duncan and Former Chairman of the Texas House of Representatives, Joseph M. Nixon, that "[a]s an aggregate cap on all damages, the wrongful death and survival action cap will apply secondarily to any cap on non[-]economic damages. Therefore, any damage award will be limited by applying the non[-]economic damage cap, and then will be further limited by applying the total cap in cases where it applies. . . . Nothing in the Act forces the defendant to choose one cap to the exclusion of any other caps that might also apply.").

Based on the foregoing, we believe that the Legislature intended for the wrongful death and survival action cap, section 74.303, to apply secondarily to the cap on non-economic damages, section 74.301(b), especially considering that appellees' wrongful death and survival claims arose out of a health care liability claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.301(b), 74.303; *see also* TEX. GOV'T CODE ANN. § 312.005; *Alpha Invesco Corp.*, 139 S.W.3d at 700; *L.S. Ranch, Ltd.*, 970 S.W.2d at 752. We do not believe that section 74.303 should be read to the exclusion of section 74.301(b). *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.301(b), 74.303.

In this case, the trial court did not award any of the five claimants more than $250,000 in non-economic damages individually. In fact, the sum total of non-economic damages awarded to the claimants was $250,000. This figure comports with section

74.001(a)(2)'s requirement that "all persons claiming to have sustained damages as the result of the bodily injury or death of a single person are considered a single claimant" and the $250,000 damage cap provided in section 74.301(b). *See id.* §§ 74.001(a)(2) (Vernon 2005), 74.301(b); *see also Perea*, 2010 Tex. App. LEXIS 5980, at **93-95 (concluding that for purposes of applying the health care liability damage caps, the estate of the deceased and the deceased's four sons all constituted one claimant). We cannot say that the trial court erred in applying the damage cap provisions provided in sections 74.301(b) and 74.303. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.301(b), 74.303. Accordingly, we overrule appellees' second cross-issue.

## V. CONCLUSION

Because we have overruled all issues and cross-issues on appeal, we affirm the judgment of the trial court.

ROGELIO VALDEZ
Chief Justice

Delivered and filed the
30th day of September, 2010.

54