NUMBER 13-09-00434-CV


COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG 


 


DUANE MUHS, INDIVIDUALLY AND AS

NEXT FRIEND OF ASHTON MUHS, A MINOR, Appellant,


v.

 

WHATABURGER, INC., ROBERT GONZALEZ

GARZA, AND MICHAEL LEE METTLEN, Appellees.

 
 

On appeal from the 357th District Court 

 of Cameron County, Texas.

 


 MEMORANDUM OPINION


Before Chief Justice Valdez and Justices Rodriguez and Vela

 Memorandum Opinion by Chief Justice Valdez


 Appellant, Duane Muhs ("Muhs"), individually and as next of friend of Ashton Muhs
("Ashton"), a minor, appeals from the trial court's judgment that he take nothing on his
claim for personal injuries sustained by Ashton in an auto-pedestrian accident. The jury
found that appellees, Whataburger, Inc., Robert Gonzalez Garza, and Michael Lee Mettlen
were negligent, but it also found that Ashton was negligent. The jury found Mettlen grossly
negligent and awarded Muhs $25,000 in punitive damages. The jury apportioned
negligence and assigned 37% to Whataburger and Garza combined, 3% to Mettlen, and
60% to Ashton. Because Ashton's negligence exceeded 50%, the trial court rendered a
take-nothing judgment in appellees' favor. See Tex. Civ. Prac. & Rem. Code Ann. § 33.001
(Vernon 2008). Muhs appeals, arguing by seven issues that the trial court erroneously
excluded key evidence during the trial and refused to include pertinent instructions and a
question in the jury charge. We affirm.I. Background (1)

 On October 31, 2005, fourteen-year-old Ashton injured her right leg in an auto-pedestrian accident in Laguna Heights, Texas, as she attempted to cross Highway 100 on
foot. (2) Ashton testified that she went to her friend's house on the evening of October 31,
to meet a group of friends to go trick-or-treating. When her friend's mother failed to pick
up the group to take them trick-or-treating, Ashton and four other minors decided to cross
Highway 100 to go to her friend's grandmother's house and ask for a ride to Port Isabel,
Texas. Ashton stated that traffic was heavy on Highway 100, and because there was no
designated crosswalk, she and a friend waited at the curb for the eastbound traffic to clear. 
The girls then proceeded across the two eastbound lanes and waited in the center lane for
westbound traffic to clear. Ashton testified that after approximately five minutes, Mettlen,
who was driving a white Ford F-150 pickup truck, stopped in the westbound inside lane and
motioned for Ashton to cross in front of his truck. Ashton stated that she remembered
taking "a couple of steps" and then "[w]aking up on the street." Ashton stated that she did
not walk far enough to get to the outside westbound lane. Ashton suffered an injury to her
right knee that required surgery and left a scar from the middle of her thigh to her knee.

 Mettlen testified that he went fishing at South Padre Island ("the Island") on the
morning of October 31, 2005. While there, Mettlen consumed approximately one pint of
vodka. He left the Island sometime between 6:30 p.m. and 7:00 p.m. to return to his home
in Harlingen, Texas. Mettlen stated that he knew he was intoxicated when he left the
Island, but he did not feel that he "was too intoxicated to drive." Mettlen left the Island
driving westbound on Highway 100. 

 Mettlen testified that he saw children out trick-or-treating and that the traffic was
"very heavy" when he entered Port Isabel. Mettlen was driving in the inside lane
somewhere near Port Isabel High School when he noticed Garza driving behind him in a
Chevrolet pickup truck. Mettlen testified that Garza was "driving a little faster" than he was,
so Mettlen "got over in the [outside] lane" and allowed Garza to pass him. Mettlen stated
that the speed limit was 35 miles-per-hour and estimated that Garza was driving at a rate
of 40 miles-per-hour. After Garza passed him, Mettlen moved back over into the inside
lane behind Garza. Mettlen testified that a short time later, he saw a group of people on
the sidewalk on the southside of Highway 100. Mettlen stated "there was [sic] 12 or 13
people, and Ashton was the only one that ran out, and she ran right in front of Mr. Garza's
pickup." Mettlen testified that Ashton was hit by the "front-end" of Garza's truck and that
upon impact, Ashton "traveled a few feet in front of [Garza's] pickup truck." Mettlen
testified that upon seeing the accident, he pulled his truck to the side of the road and
began "helping to make sure that [Ashton] did not get hit by another vehicle."

 Garza testified that he does not agree with Mettlen's account of the accident. 
Garza, a lead technician for Whataburger, testified that on October 31, 2005, he traveled
through Laguna Heights after leaving a remodeling job at the Port Isabel Whataburger. 
Garza was driving a white Chevrolet three-quarter ton pickup truck owned by Whataburger. 
Garza testified that he was in the outside westbound lane traveling at approximately 25
miles-per-hour when he entered Laguna Heights. Garza noticed Mettlen's truck ahead of
him in the inside lane. Garza testified, "all of a sudden, [Mettlen] stopped and jerked his
truck to my lane. At that point I broke lane [sic] with his truck and there was an impact, and
I pulled over to the shoulder and I parked." Although Garza originally believed that he
might have hit Mettlen's truck, when he saw Ashton lying on the ground in front of Mettlen's
truck, he realized that his truck had collided with Ashton. 

 There was no damage to Mettlen's truck. Garza testified that his truck sustained
some damage and that repairs and repainting were done to the truck's front left fender, left
bumper, left front door, and left side mirror. Garza also stated that there was a horizontal,
dark red mark about three quarters of an inch wide that extended along the driver's side
of Garza's truck from below the windshield to above the rear tire. Garza testified that he
noticed a backpack that Ashton had at the time of the collision was the same color as the
mark on the side of his truck. Garza opined that the red mark was caused by Ashton's
backpack and that Ashton "ran into [his] truck."

 Texas Department of Public Safety Trooper Cory Pinnell investigated the October
31 collision. Trooper Pinnell testified that he spoke to Garza at the scene and that Garza
told him that he was traveling in the inside westbound lane of Highway 100 behind Mettlen
when Mettlen stopped or slowed down. Garza told Trooper Pinnell that he "changed to the
outside lane to go around [Mettlen's] vehicle, and as he was going around it, he heard that
he hit something . . . didn't know what it was, didn't see anything." Garza "assumed that
he had struck" Mettlen's truck and parked on the shoulder. However, "as [Garza] got out,
he realized that he had struck [Ashton]." Trooper Pinnell also testified as to the what
Mettlen told him while at the scene of the accident. Mettlen told Pinnell that "he observed
some trick-or-treaters [who] were in the center turn lane. [Mettlen] stopped and motioned,
you know, told them to go ahead and cross in front of him. He stopped his vehicle to allow
them to cross, and that's when [Ashton] got hit." 

 Trooper Pinnell noticed damage on Garza's truck "[o]n the left front quarter panel
up around the front headlight, turn signal, in front of the tire area." Trooper Pinnell testified
that he did not notice a red mark along the driver's side of Garza's truck; however, on
cross-examination, he admitted that in an earlier deposition he had stated that he had seen
a red mark along the side of Garza's truck. Trooper Pinnell stated that a red mark on
Garza's truck could suggest the possibility of a side-swipe and that the mark "could have
been" made by Mettlen's passenger-side mirror as Garza's truck passed by. However,
Trooper Pinnell testified that there was "no evidence to support" the conclusion that
Garza's vehicle moved into Mettlen's lane and hit Mettlen's truck. Trooper Pinnell opined
that the accident occurred when Ashton "took a step into the outside lane or jogged into
the outside west[]bound lane, and collided with [the side of Garza's truck]."

 The jury found each of the parties negligent, found Mettlen grossly negligent, and
awarded Ashton $25,000 in punitive damages. The jury apportioned responsibility as
follows: 60% to Ashton; 37% to Whataburger and Garza combined; and 3% to Mettlen. 
A take-nothing judgment was rendered in favor of the appellees. See id. This appeal
ensued.

II. Evidentiary Rulings

 By his first, fifth, and sixth issues, Muhs contends, respectively, that the trial court
erred by excluding: (1) his testimony, diagrams, photographs and video recordings that
related to the "theoretical possibility" that Garza's truck sideswiped Mettlen's vehicle; (2) 
evidence of "Mettlen's prior recent incident of public intoxication and possession of Valium";
and (3) evidence of "Mettlen's four subsequent automobile accidents."

A. Standard of Review

 The exclusion of evidence is a matter within the "sound" discretion of the trial court. 
See Tex. Dep't of Transp. v. Able, 35 S.W.3d 608, 617 (Tex. 2000); City of Brownsville v.
Alvarado, 897 S.W.2d 750, 753 (Tex. 1995); State Office of Risk Mgmt. v. Trujillo, 267
S.W.3d 349, 351 (Tex. App.-Corpus Christi 2008, no pet.). Thus, we review the exclusion
of evidence under an abuse of discretion standard. See In re J.P.B., 180 S.W.3d 570, 575
(Tex. 2005); Trujillo, 267 S.W.3d at 351. A trial court abuses its discretion if it acts
arbitrarily or without reference to guiding rules and principles. Walker v. Packer, 827
S.W.2d 833, 840 (Tex. 1992); Trujillo, 267 S.W.3d at 351.

 For the exclusion of evidence to constitute reversible error, the complaining party
must show that (1) the trial court committed error, and (2) the error probably caused the
rendition of an improper judgment. State v. Cent. Expressway Sign Assocs., 302 S.W.3d
866, 870 (Tex. 2009). A successful challenge to evidentiary rulings usually requires the
complaining party to show that the judgment turns on the particular evidence excluded or
admitted. Bay Area Healthcare Group, Ltd. v. McShane, 239 S.W.3d 231, 234 (Tex.
2007); Nissan Motor Co. v. Armstrong, 145 S.W.3d 131, 144 (Tex. 2004). In making this
determination, we review the entire record. Reliance Steel & Aluminum Co. v. Sevcik, 267
S.W.3d 867, 871 (Tex. 2008); Nissan Motor Co., 145 S.W.3d at 144.

B. Exclusion of Muhs's Testimony and Related Evidence

 By his first issue, Muhs contends that "[t]he trial court erred in excluding [his]
testimony and his diagrams of the accident scene," as well as "his photographs and video
recording of the pickups[,] which showed that a sideswipe probably occurred." 

 Although Muhs was allowed to testify at trial, the trial court refused to allow him to
present testimony regarding the possibility that Garza's truck sideswiped Mettlen's truck
before colliding with Ashton. Muhs did not witness the October 31, 2005 accident;
however, in an offer of proof outside the presence of the jury, Muhs testified that after
Trooper Pinnell's deposition was taken on December 3, 2008, he went to the scene of the
accident to research the theoretical possibility that Garza's vehicle sideswiped Mettlen's
vehicle and struck Ashton in Mettlen's lane. Muhs took measurements and made "to-scale
diagrams" of the scene. Muhs later located Garza's truck and a Ford F-150 that he
described as "identical" to the Ford that Mettlen was driving at the time of the accident. (3) 
Muhs took photographs and measurements of the vehicles. Muhs testified that, upon
inspection of Garza's truck, he observed a repaired horizontal scratch along the driver's
side of the truck as well as an "impact crack" on the outside of the truck's driver's side
mirror. Using Garza's truck and the F-150 Muhs deemed "identical" to Mettlen's, Muhs
filmed a video, wherein he attempted to "recreate the streak" on Garza's truck by taping
a dry erase marker to the "furthest-most point" on the F-150 and driving Garza's truck
alongside it. Muhs testified that he was able to match the mark made by the dry erase
marker to the horizontal scratch on Garza's truck by "turn[ing] left into the inside lane
across the front of the Ford [F-150] pickup." Based on his observations and
measurements, Muhs testified that the scratch on Garza's truck could have been caused
by Garza sideswiping the passenger's side mirror of Mettlen's F-150 truck. 

 In ruling that the above evidence be excluded, the trial court stated:

 This quite clearly is an accident reconstruction hypothetically alleging
a sideswipe, and for all of the reasons that have been mentioned, and in no
particular order, Mr. Muhs is not an expert.


 The hypothetical testing was done in February of 2009, and in
conjunction with the rules of procedure and rules of evidence that apply to
this case, his testimony relevant to these issue [sic] will not be allowed.


 Accident reconstruction constitutes scientific evidence. See Waring v. Wommack,
945 S.W.2d 889, 892 (Tex. App.-Austin 1997, no writ). Rule 702 of the Texas Rules of
Evidence provides that if scientific knowledge "will assist the trier of fact to understand the
evidence or to determine a fact in issue, a witness qualified as an expert by knowledge,
skill, experience, training, or education may testify thereto in the form of an opinion or
otherwise." Tex. R. Evid. 702. Thus, "Texas has a long history of allowing qualified
accident reconstruction experts to testify regarding the way in which an accident occurred." 
Lincoln v. Clark Freight Lines, Inc., 285 S.W.3d 79, 83 (Tex. App.-Houston [1st Dist.] 2009,
no pet.) (citing Chavers v. State, 991 S.W.2d 457, 460-61 (Tex. App.-Houston [1st Dist.]
1999, pet. ref'd); Waring v. Wommack, 945 S.W.2d 889, 893 (Tex. App.-Austin 1997, no
writ); Trailways, Inc. v. Clark, 794 S.W.2d 479, 483 (Tex. App.-Corpus Christi 1990, writ
denied); DeLeon v. Louder, 743 S.W.2d 357, 359 (Tex. App.-Amarillo 1987), writ denied
per curiam, 754 S.W.2d 148 (Tex. 1988); Bolstad v. Egleson, 326 S.W.2d 506, 519 (Tex.
Civ. App.-Houston 1959, writ ref'd n.r.e.)). 

 Whataburger argues that Muhs's testimony and related evidence constitutes
accident reconstruction evidence and, because Muhs was not qualified as an expert, was
properly excluded. Muhs concedes that he was not qualified as an expert witness but
insists that "arguments about his qualifications or designation as an expert are irrelevant"
because he only intended to testify regarding his "observations" and did not intend to
provide any testimony regarding accident reconstruction. We disagree. 

 During Muhs's offer of proof, his attorney asked:

Q. In addition to--in addition to these measurements of the scene, did
you research the theoretical possibility of a sideswipe between Mr.
Garza's vehicle and Mr. Mettlen's stopped Ford pickup?


A. Yes, I did.


Q. And after researching the theoretical possibility of it, did you actually
go out and start measuring vehicles to see if that could happen?


A. Yes, preliminary, yes.


Q. And after your preliminary measurements, did you start to think that
maybe this could have happened?


A. Very much so.


 . . . . 


Q. . . . And you were trying to figure out what put this streak scratch [sic]
down the side of Mr. Garza's truck?


A. Most definitely.


Q. All right. And it was your feeling that a mirror on a F-150 identical to
that that Mr. Mettlen was driving could have caused this scratch?


A. Yes. As Trooper Pinnell said, it had to be from another vehicle
because it stayed in a horizontal position.


 . . . .


Q. --did you try to recreate the streak on this [Garza's] truck shown on
Plaintiff's Exhibit 19?


A. Yes, I did.


Q. And what was--how were you able to do that, or were you able to do
that?


A. Yes, I was.


Q. How were you able to do that?


A. I had to turn left into the inside lane across the front of the Ford
pickup to do so.


 . . . .


Q. Okay. Would that explain how your daughter was hit by the corner of
that truck?


A. It would be very consistent with all the testimony, including her own,
that she never got out from in front of [Mettlen's] Ford truck.


Q. And that shows how it could actually happen?


A. It did. 


 Muhs neither witnessed the accident, nor inspected the vehicles or scene
immediately after the accident; instead, Muhs made his "observations" in conjunction with,
and as a result of, his attempt to "research the theoretical possibility of a sideswipe"
between Garza's vehicle and Mettlen's F-150 by demonstrating that the repaired scratch
that Muhs claimed to have located on the side of Garza's vehicle was caused by contact
with Mettlen's passenger side mirror. Moreover, the above testimony demonstrates that
Muhs sought to offer more than mere "observations" of the vehicles involved in the incident
in question. It is clear that Muhs's "feeling that a mirror on a F-150 identical to that that Mr.
Mettlen was driving could have caused this scratch" was based on his reconstruction of the
positions of the vehicles at the time of the accident. Accordingly, the trial court did not
abuse its discretion by excluding Muhs's testimony and related exhibits because (1) the
court was within its discretion to conclude that Muhs was in fact being called as an expert
in accident reconstruction, see Lopez v. Foremost Paving, Inc., 796 S.W.2d 473, 481 (Tex.
App.-San Antonio 1990, writ dism'd); and (2) Muhs concedes that he was not qualified as
an expert witness. See Tex. R. Evid. 702. Accordingly, we overrule Muhs's first issue. 

C. Exclusion of Mettlen's Prior Arrest

 By his fifth issue, Muhs contends that the trial court erred in excluding evidence of
Mettlen's prior arrest for public intoxication and possession of a controlled substance. 

 Muhs testified that went fishing at the Island on the morning of October 31, 2005,
and consumed approximately one pint of vodka. Mettlen stated that when he left the Island
that evening he knew he was intoxicated, but did not feel that he "was too intoxicated to
drive." Mettlen denied stopping and motioning for Ashton to cross in front of his truck and
insisted that Garza was approximately 200 to 300 yards in front of him in the inside lane
when Garza's vehicle collided with Ashton. Upon seeing Ashton lying on the ground,
Mettlen pulled his truck to the side of the road and "help[ed] make sure that [Ashton] did
not get hit by another vehicle." Mettlen testified that he spoke to police at the scene and
gave a statement before returning to his vehicle and driving off. 

 Officers pulled Mettlen over just outside Laguna Heignts and took him back to the
scene of the accident. Mettlen was arrested for driving while intoxicated ("DWI"). A
breathalyzer examination revealed that his blood alcohol content was almost twice the legal
limit. Mettlen was also charged with possession of a controlled substance after officers
found Valium in his pocket. Mettlen later pleaded guilty to possession of a controlled
substance, and the DWI charge was dropped.

 At trial, Muhs sought to introduce evidence that Mettlen had been arrested three
weeks before the October 31, 2005 accident. Muhs's offer of proof revealed that Mettlen
was arrested for public intoxication by the Kingsville Police Department on October 9,
2005, and was found to be in possession of Valium. On appeal, Muhs contends that the
evidence of Mettlen's prior arrest for public intoxication and possession of Valium should
have been admitted because it "is evidence of a wanton and willful disregard for the safety
of others and relevant to [Muhs's] gross negligence claim." 

 Rule 404 of the Texas Rules of Evidence generally prohibits evidence of a person's
other crimes from being admitted into evidence; however, Muhs argues that the evidence
of Mettlen's October 9 arrest should have been admitted as an exception to rule 404
because it constitutes evidence of Mettlen's state of mind at the time of the accident. See
Tex. R. Evid. 404(b) ("Evidence of other crimes, wrongs or acts is not admissible to prove
the character of a person in order to show conformity therewith."); Castro v. Sebesta, 808
S.W.2d 189, 194 (Tex. App.-Houston [1st Dist.] 1991, no writ) (holding that the trial court
erred in excluding testimony that appellant regularly smoked marihuana while driving a car
because, when punitive damages and gross negligence are at issue, the appellant's state
of mind is relevant to prove the level of culpability).

 Assuming without deciding that the trial court did err in excluding this evidence, we
nonetheless conclude that it did not cause the rendition of an improper judgment. See
Tex. R. App. P. 44.1(a). Muhs claims that the trial court erred in excluding evidence of
Mettlen's prior arrest because the evidence "was admissible for the purpose of proving his
gross negligence." However, Muhs's argument ignores the fact that although the jury
apportioned only 3% of the fault of the accident to Mettlen, it also expressly found that
Mettlen was grossly negligent and awarded $25,000 in punitive damages. Thus, because
the jury entered a favorable finding as to Muhs on the issue of Mettlen's gross negligence,
the trial court's exclusion of Mettlen's prior arrest caused no harm to Muhs. See id. 
Accordingly, we overrule Muhs's fifth issue.

D. Exclusion of Mettlen's Subsequent Automobile Accidents

 By his sixth issue, Muhs challenges the trial court's exclusion of evidence of
Mettlen's involvement in four automobile accidents that occurred after the date in question. 
During trial, Muhs called Mettlen as an adverse witness and questioned him, in pertinent
part:

Q. Do you believe drivers should be extra careful on Halloween to be on
the lookout for children?


A. Certainly.


Q. Were you trying to drive carefully?


A. Always.


Q. And you were trying to drive carefully because you knew you were
intoxicated?


A. Yes, sir, but I drive carefully anyway.


Q. You're telling the jury that you're a careful driver?


A. Yes, I am.


Q. Do you want this jury to believe that you are a careful driver?


A. Well, I would think so.


 . . . .


Q. Are you trying to tell this jury, again, that you are a careful driver?


A. During that evening, of course.


 . . . . 


Q. Didn't you say that to the jury, that you are a careful driver?


A. Yes, I am a careful driver.

 

 The record reflects that Mettlen was involved in four automobile accidents after
October 31, 2005. (4) Muhs asserts that evidence of these subsequent accidents should
have been admitted "for the limited purpose of impeachment" because Mettlen "opened
the door" to such questioning by "leav[ing] the jury with the false impression that he was
'always' a 'careful' driver." 

 Although, "[s]pecific instances of the conduct of a witness, for the purpose of
attacking or supporting the witness' credibility, other than conviction of crime . . . may not
be inquired into on cross-examination of the witness nor proved by extrinsic evidence," 
Tex. R. Evid. 608(b), a trial court may admit evidence necessary to explain a matter on
which the opposing party has "opened the door." See Tex. R. Evid. 107. However,
"[e]vidence which is not relevant is inadmissible." Id. at R. 402. Mettlen contends that the
trial court did not err by excluding evidence of his subsequent automobile accidents
because such evidence is irrelevant and unfairly prejudicial. Assuming without deciding
that the trial court did err in excluding this evidence, we nonetheless conclude that it did
not cause the rendition of an improper judgment. See Tex. R. App. P. 44.1(a). 

 The proportionate responsibility statute requires the jury to determine the
percentage of responsibility with respect to each person's causing or contributing to cause
in any way the harm for which recovery of damages is sought. See Tex. Civ. Prac. & Rem.
Code Ann. § 33.003(a) (Vernon 2008). "[A] claimant may not recover damages if his
percentage of responsibility is greater than 50 percent." Id. § 33.001. At trial, Mettlen
testified that he was a careful driver; however, this testimony was undermined by Mettlen's
own admission that he consumed a pint of vodka on the day in question, was arrested for
DWI at the scene of the accident, and failed a breathalyzer test with a blood alcohol
content that was nearly twice the legal limit. In light of the foregoing, we see nothing to
indicate that Mettlen probably would have been apportioned a higher percentage of
fault--or that Ashton's proportionate responsibility would have been decreased--had the
evidence of Mettlen's subsequent automobile accidents been admitted. See Tex. R. App.
P. 44.1(a).

 Moreover, in question one of the jury charge, the jury found all three parties to be
negligent. Muhs does not argue that the jury's answer on the negligence question would
have been different if the complained of evidence had been admitted. Instead, he
contends that the trial court's erroneous exclusion of the evidence probably caused the
rendition of an improper judgment because the jury would not have reached the same
apportionment of liability if the evidence of Mettlen's subsequent automobile accidents had
been admitted. See id. Despite this assertion, Muhs fails to adequately explain how he
was harmed by the trial court's exclusion of Mettlen's subsequent arrests. See id. at R.
38.1(i), 44.1; see also Rio Grande Reg'l Hosp., Inc. v. Villarreal, No. 13-08-00542-CV,
2010 WL 3810019, at *25 (Tex. App.-Corpus Christi Sept. 30, 2010, no pet. h.). 
Specifically, Muhs fails to explain how the jury's proportionate responsibility calculations
would change if evidence of Mettlen's subsequent automobile accidents was admitted. 
Moreover, Muhs does not assert that the admission of the excluded evidence would reduce
Ashton's percentage of responsibility below fifty percent and convert the take-nothing
judgment into a judgment under which damages could be awarded. See Tex. Civ. Prac.
& Rem. Code Ann. § 33.001. Because Muhs has failed to articulate the harm, if any,
caused by the exclusion of Mettlen's subsequent automobile accidents, we cannot
conclude that the exclusion of this evidence probably caused the rendition of an improper
judgment. Rio Grande Reg'l Hosp., Inc., 2010 WL 3810019, at *25. Accordingly, we
overrule Muhs's sixth issue.

III. Charge Error

 By his second, third, and fourth issues, Muhs argues that the trial court erred by
refusing to submit various instructions concerning Texas highway laws, voluntary
undertaking of duty, and spoliation of evidence. By his seventh issue, Muhs contends that
the trial court erred by failing to submit a separate question concerning whether Mettlen
committed intoxication assault.

A. Standard of Review and Applicable Law

 The standard of review for alleged error in the jury charge is abuse of discretion. 
See Shupe v. Lingafelter, 192 S.W.3d 577, 579 (Tex. 2006) (per curiam). "When a trial
court refuses to submit a requested instruction on an issue raised by the pleadings and
evidence, the question on appeal is whether the request was reasonably necessary to
enable the jury to render a proper verdict." Id. (citing Tex. Workers' Comp. Ins. Fund v.
Mandlbauer, 34 S.W.3d 909, 912 (Tex. 2000)); see also Tex. R. Civ. P. 277 (providing that
"[t]he court shall submit such instructions and definitions as shall be proper to enable the
jury to vender a verdict"), 278 (providing that "[t]he court shall submit the questions,
instructions and definitions . . . which are raised by the written pleadings and the
evidence"). 

 Trial courts are afforded considerable discretion when submitting instructions, and
although trial courts must explain any technical or legal terms to the jury, they possess
wide discretion to determine whether such explanations are sufficient. Lumbermens Mut.
Cas. Co. v. Garcia, 758 S.W.2d 893, 894 (Tex. App.-Corpus Christi 1988, writ denied);
K-Mart Corp. v. Trottie, 677 S.W.2d 632, 636 (Tex. App.-Houston [1st Dist.] 1984, writ ref'd
n.r.e.). A trial court abuses its discretion if it acts arbitrarily or without reference to guiding
rules and principles. Walker, 827 S.W.2d at 840. 

 We will not reverse a jury verdict for the trial court's refusal to submit an instruction
unless the refusal probably caused the rendition of an improper judgment or probably
prevented the complaining party from presenting the case on appeal. Columbia Rio
Grande Healthcare, L.P. v. Hawley, 284 S.W.3d 851, 856 (Tex. 2009); Shupe, 192 S.W.3d
at 579. Charge error is generally considered harmful if it relates to a contested, critical
issue. Hawley, 284 S.W.3d at 856. "Error in the omission of an issue is harmless 'when
the findings of the jury in answer to other issues are sufficient to support the judgment.'" 
Shupe, 192 S.W.3d at 579 (quoting Boatland of Houston, Inc. v. Bailey, 609 S.W.2d 743,
750 (Tex. 1980)); see also Alvarado, 897 S.W.2d at 752 (noting that a jury question may
be immaterial, and therefore its submission harmless, "when its answer can be found
elsewhere in the verdict or when its answer cannot alter the effect of the verdict").

B. Texas Transportation Code and Voluntary Undertaking of Duty

 By his second issue, Muhs argues that the trial court's refusal to instruct the jury on
various provisions of the Texas Transportation Code in connection with the general
negligence question submitted to the jury resulted in an erroneous jury charge. (5) 
Specifically, Muhs contends that the following instructions were necessary:

Driving on Roadway Laned for Traffic. An operator on a roadway divided
into two or more clearly marked lanes for traffic, (1) shall drive as nearly as
practical entirely within a single lane, and (2) may not move from the lane
unless that movement can be made safely. . . . 


Following Distance. An operator shall, if following another vehicle, maintain
an assured clear distance between the two vehicles so that, considering the
speed of the vehicles, traffic, and the conditions of the highway, the operator
can safely stop without colliding with the preceding vehicle or veering into
another vehicle, object, or person on or near the highway. . . .


Maximum Speed Requirement. An operator may not drive at a speed
greater than is reasonable and prudent under the circumstances then
existing. . . .


Maximum Speed Requirement. An operator may not drive a vehicle at a
speed greater than is reasonable and prudent under the conditions and
having regard for actual and potential hazards then existing. . . .


Maximum Speed Requirement. An operator shall control the speed of the
vehicle as necessary to avoid colliding with another person or vehicle that is
on or entering the highway in compliance with law and the duty of each
person to use due care. . . .


Maximum Speed Requirement. An operator shall drive at an appropriate
reduced speed if a special hazard exists with regard to traffic, including
pedestrians, or weather or highway conditions. . . . 


Drivers to Exercise Due Care. The operator of a vehicle shall, (1) exercise
due care to avoid colliding with a pedestrian on a roadway, (2) give warning
by sounding the horn when necessary, and (3) exercise proper precaution
on observing a child or an obviously confused or incapacitated person on a
roadway. . . . 


(Emphasis in original). See Tex. Transp. Code Ann. §§ 545.060, 545.062(a), 545.351(a),
(b), (c)(5), 552.008 (Vernon 1999). Muhs argues that the trial court's exclusion of the
above instructions prevented the jury from rendering a proper verdict because it was
unable "to properly determine who had the right-of-way." 

 Additionally, by his third issue, Muhs asserts that the trial court erred by refusing to
include the following instruction:

 Voluntary Undertaking of Duty. You are instructed that a person
who undertakes an affirmative course of action for the benefit of another has
a duty to exercise reasonable care that the other person will not be injured
thereby. A person who owes no legal duty, but who gratuitously acts,
assumes a duty to act with reasonable care so as to prevent harm to
another.


(Emphasis in original). Muhs argues that the evidence demonstrates that if Mettlen had
the right-of-way, he voluntarily yielded it when he gestured to Ashton to "cross in front of
his pickup truck" and that "[a]s a grown adult, Mettlen assumed the responsibility of acting
reasonably when he gestured a 14-year-old girl to enter his lane . . . ." Muhs insists that
"the jury was 'confused' in deliberating the negligence of the parties" because of the trial
court's refusal to submit the above instruction.

 In Brookshire Bros., Inc. v. Lewis, a broad-form negligence instruction was
submitted to the jury without explanatory instructions regarding the specific duties
employers owe to their employees. 997 S.W.2d 908, 921 (Tex. App.-Beaumont 1999, pet.
denied). The court of appeals noted that a trial court is required to give definitions of legal
and technical terms and states that "[a]nything else, however interesting or relevant to the
case in general, that does not aid the jury in answering the issues, must be excluded." Id. 
The Brookshire Bros. court held that because "[t]he jury was properly instructed on the
terms of 'negligence,' 'ordinary care,' and 'proximate cause,'" the explanatory instructions
constituted "surplus instructions" and were properly excluded. Id.

 In the present case, the jury was asked to determine whether each of the three
parties was negligent. As in Brookshire Bros., the jury charge instructed the jury on the
terms of "negligence," "ordinary care," and "proximate cause." Thus, the excluded
instructions were not reasonably necessary to enable the jury to render a proper verdict
and were properly excluded as surplus instructions. See id. Accordingly, the trial court's
refusal to instruct the jury with these instructions was not an abuse of discretion. See id. 

 Moreover, although Muhs contends that the trial court's refusal to submit the above
instructions probably caused the rendition of an improper judgment, he fails to adequately
explain how he was harmed by the trial court's exclusion of the instructions. See Tex. R.
App. P. 38.1(i), 44.1; Rio Grande Reg'l Hosp., 2010 WL 3810019, at *25. Specifically,
Muhs fails to explain how the jury's proportionate responsibility calculations would change
if the above instructions had been included in the jury charge. Furtermore, Muhs does not
assert that the admission of the above instructions would reduce Ashton's percentage of
responsibility below fifty percent and convert the take-nothing judgment into a judgment
under which damages could be awarded. See Tex. Civ. Prac. & Rem. Code Ann. § 33.001. 
Because Muhs has failed to articulate the harm, if any, caused by the exclusion of the
above instructions, we cannot conclude that their exclusion probably caused the rendition
of an improper judgment. See Rio Grande Reg'l Hosp., Inc., 2010 WL 3810019, at *25. 
Accordingly, we overrule Muhs's second and third issues.

C. Spoliation

 By his fourth issue, Muhs contends that the trial court erred by refusing to include
an instruction on spoliation in the jury charge. Specifically, Muhs contends that Sandra
Hale, Whataburger's director of risk management, "negligently or intentionally" destroyed
photographs that showed the damage that Garza's vehicle sustained in the October 31,
2005 incident. Muhs argues that the photographs would have assisted him in proving that
Garza's truck sideswiped Mettlen's vehicle before hitting Ashton and that the trial court's
refusal to submit a spoliation instruction "was harmful and probably caused or contributed
to an improper judgment."

 During trial, Hale testified that she is Whataburger's director of risk management
and is responsible for overseeing "third party administrators for [Whataburger's] non-subscriber workers comp program and general liability and property damage for
Whataburger buildings." Hale stated that liability claims against Whataburger employees
who drive vehicles do not fall under her department. The jury heard evidence that while
Hale was conducting a class at a Whataburger training center in the Rio Grande Valley,
she learned of Garza's October 31, 2005 collision. Hale testified that after the incident, she
took "less than five" photographs of Garza's truck with her Sprint cellular telephone, but
never printed out the photos. Hale stated that she was unable to produce the photographs
at trial because she no longer had access to them. Hale explained that in 2006, she
switched her cell phone provider from Sprint to Verizon in order to take advantage of the
OnStar feature, which required Verizon, in a new vehicle that she had purchased. Hale
testified that she attempted to retrieve the photographs in 2008 at the request of
Whataburger's attorney by contacting Sprint via telephone and online chat. A Sprint
representative informed Hale that because her Sprint account was no longer active, the
photographs were unavailable. 

 When asked her purpose for photographing Garza's truck, Hale stated, "No
purpose, in case someone needed them for the future, but no purpose at all." Hale
testified that at the time she photographed the truck she "wouldn't have known" that a
lawsuit concerning the October 31, 2005 incident would be filed. 

 "A spoliation instruction is an instruction given to the jury outlining permissible
inferences they may make against a party who has lost, altered, or destroyed evidence." 
Tex. Elec. Coop. v. Dillard, 171 S.W.3d 201, 208 (Tex. App.-Tyler 2005, no pet.) (citing
Brewer v. Dowling, 862 S.W.2d 156, 159 (Tex. App.-Fort Worth 1993, writ denied)). The
use of a spoliation instruction is generally limited to two circumstances: (1) the deliberate
destruction of relevant evidence; and (2) the failure of a party to produce relevant evidence
or to explain its non-production. Wal-Mart Stores, Inc. v. Johnson, 106 S.W.3d 718, 721
(Tex. 2003) (citing Anderson v. Taylor Publ'g Co., 13 S.W.3d 56, 61 (Tex. App.-Dallas
2000, pet. denied)). Under the first circumstance, a party who has deliberately destroyed
evidence is presumed to have done so because the evidence was unfavorable to its case. 
Id. at 721-22 (citing Williford Energy Co. v. Submergible Cable Servs., Inc., 895 S.W.2d
379, 389-90 (Tex. App.-Amarillo 1994, no writ); Brewer, 862 S.W.2d at 159). Under the
second circumstance, the presumption arises because the party controlling the missing
evidence cannot explain its failure to produce it. Id. at 722 (citing Watson v. Brazos Elec.
Power Coop., Inc., 918 S.W.2d 639, 643 (Tex. App.-Waco 1996, writ denied)). "The
presumption does not apply when documents are merely lost." Cresthaven Nursing
Residence v. Freeman, 134 S.W.3d 214, 227 (Tex. App.-Amarillo 2003, no pet.) (citing
Williford Energy Co., 895 S.W.2d at 389-90); Brewer, 862 S.W.2d at 160. A trial court may
be guided by the following three factors in determining whether a spoliation presumption
is justified: (1) whether there was a duty to preserve evidence; (2) whether the alleged
spoliator either negligently or intentionally spoliated evidence; and (3) whether the
spoliation prejudiced the nonspoliator's ability to present its case or defense. Trevino v.
Ortega, 969 S.W.2d 950, 954-55 (Tex. 1998) (Baker, J., concurring); Whirlpool Corp. v.
Camacho, 251 S.W.3d 88, 102 (Tex. App.-Corpus Christi 2008), rev'd on other grounds,
298 S.W.3d 631 (Tex. 2009).

 Assuming there was a duty to preserve the evidence, the trial court did not abuse
its discretion in refusing to submit a spoliation instruction because Whataburger explained
its non-production of the photographs and there is no evidence that the photographs were
either negligently or intentionally spoliated or that the alleged spoliation prejudiced Muhs's
ability to present his case. See Johnson, 106 S.W.3d at 721-22; Whirlpool, 251 S.W.3d
at 102. Hale testified that she took "less than five" photographs of Garza's truck on her
Sprint cellular phone. Although Hale testified that she had emailed an internet link to
access the photos to someone investigating the case, there is no evidence that Hale was
ever in possession of hard copies of the photos that she had taken. In 2006, Hale
switched from Sprint to Verizon in order use the OnStar feature in her vehicle. 
Unbeknownst to Hale, upon terminating her Sprint account, access to all of the
photographs that she had taken on her Sprint phone were no longer available. Hale
testified that as a result, she was no longer able to view photographs--those of Garza's
truck as well as personal photographs--that she had taken with her Sprint phone. In light
of this evidence, the trial court could have concluded that Whataburger did not negligently
or intentionally destroy the photographs of Garza's truck. See Williford Energy Co., 895
S.W.2d at 389-90; Brewer, 862 S.W.2d at 160. 

 Moreover, Garza testified that his truck sustained damage as a result of the October
31, 2005 incident, and he marked photographs of his truck to indicate the location of the
red mark that ran horizontally down the driver's side of his truck. Thus, any harm caused
by the non-production of the photographs was minimal in light of Garza's testimony and the
cumulative nature of the evidence and did not prejudice Muhs's ability to present his case. 
See Whirlpool Corp., 251 S.W.3d at 102. Thus, after reviewing the record, we cannot
conclude that the trial court abused its discretion by refusing to submit a spoliation
instruction. We overrule Muhs's fourth issue.

D. Intoxication Assault

 By his seventh issue, Muhs argues that the trial court erred by failing to submit the
following question:

 Do you find by a preponderance of the evidence that Michael Lee
Mettlen, by accident or mistake, while operating a motor vehicle in a public
place while intoxicated, by reason of that intoxication, caused serious bodily
injury to Ashton Muhs?


 "Serious bodily injury" means injury that creates a substantial risk of
death or that causes serious permanent disfigurement or protracted loss or
impairment of the function of any bodily member or organ.


 "Intoxicated" means:


 (A) not having the normal use of mental or physical faculties by
reason of the introduction of alcohol, a controlled substance, a drug,
a dangerous drug, a combination of two or more of those substances,
or any other substance into the body; or


 (B) having an alcohol concentration of 0.08 or more.


 "Alcohol concentration" means the number of grams of alcohol per:

 

 (A) 210 liters of breath;

 

 (B) 100 milliliters of blood; or

 

 (C) 67 milliliters of urine.


 Litigants are entitled to have controlling fact issues submitted to the jury. Triplex
Commc'ns, Inc. v. Riley, 900 S.W.2d 716, 718 (Tex. 1995). During trial, Mettlen admitted
that he was intoxicated at the time of the October 31, 2005 incident, and it was undisputed
that Ashton sustained serious bodily injury. Thus, the only fact issue was whether
Mettlen's intoxication was a cause of the accident. The trial court submitted broad-form
negligence and gross negligence questions to the jury, and the jury found that a portion of
the harm suffered by Ashton was caused by Mettlen's negligence and gross negligence. 

 Texas Rule of Civil Procedure 278 provides that "[a] judgment shall not be reversed
because of the failure to submit other various phases or different shades of the same
question." Tex. R. Civ. P. 278. Under the facts of this case, the intoxication assault
question was merely a different shade of the negligence question. See id.; Sheldon L.
Pollack Corp. v. Falcon Indus., Inc., 794 S.W.2d 380, 383 (Tex. App.-Corpus Christi 1990,
writ denied). Accordingly, the trial court did not abuse its discretion in refusing to submit
a jury question concerning intoxication assault. We overrule Muhs's seventh issue.


IV. Conclusion

 Having overruled all of Muhs's issues, we affirm the judgment of the trial court.


 ROGELIO VALDEZ

 Chief Justice

 


Delivered and filed the 

18th day of November, 2010. 
1. As this is a memorandum opinion, and the parties are familiar with the facts of the case, we will only
recite those facts which are necessary to advise the parties of this Court's decision and the basic reasons for
it. See Tex. R. App. P. 47.1, 47.4.
2. Trial testimony revealed that Highway 100 is comprised of two eastbound lanes, two westbound
lanes, a center lane, and two improved shoulders.
3. Muhs acknowledged that Mettlen had sold his Ford F-150 to a buyer in Mexico; thus, Muhs was
unable to inspect the specific Ford F-150 that Mettlen had been driving at the time of the accident.
4. Through an offer of proof, Muhs presented evidence of Mettlen's involvement in automobile
accidents that occurred on August 8, 2007, December 10, 2007, August 16, 2008, and November 26, 2008.
5. The general negligence question was submitted to the jury as follows:


 The law requires that a pedestrian shall yield right of way to a vehicle in the highway
if crossing a roadway at a place other than a marked crosswalk or at an unmarked crosswalk
at an intersection. A failure to comply with this law is negligence in itself.


 Did the negligence, if any, of those named below proximately cause the occurrence
in question?

 

 Answer "Yes" or "No" for each of the following:

 

 a. Ashton Muhs yes


 b. Whataburger, Inc. and Robert Gonzalez Garza yes


 c. Michael Lee Mettlen yes


At trial, Muhs did not object to the above instruction regarding pedestrians yielding right-of-way; moreover,
he does not challenge its inclusion on appeal.